JENNIFER RAE GUNTER
Email: Jennof4@gmail.com
1601 G St., The Dalles, OR 97058
Phone: 541-993-5366
ROBERT JAY SCHWARTZ
Email: udidya@gmail.com
3135 Mill Creek Road, The Dalles, OR 97058
Phone: 541-296-8988
HOLLY LYNN GOVE
Email:  Hollygove1969@gmail.com
421 W. 15th St, The Dalles, OR 97058
Phone: 541-993-4707
CHELSEA ELIZABETH PERRITT
Email: chelseaperritt@gmail.com
219 W. 14th Street, The Dalles, OR 97058
Phone: 503-437-8370

Plaintiffs, appearing Pro Se

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| JENNIFER RAE GUNTER, individually and as a natural parent of A.G.; ROBERT JAY SCHWARTZ, individually and as a natural parent of J.S.; HOLLY LYNN GOVE, individually and as a natural parent of M.G.; CHELSEA ELIZABETH PERRITT, individually and as a natural parent of L.P. | Case No.: 3:21-cv-01661-YY |
|        Plaintiff(s), | |
| v. | PLAINTIFF'S RESPONSE IN SUPPORT OF TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND REQUEST FOR ORAL |

ARGUMENT

NORTH WASCO COUNTY SCHOOL
DISTRICT BOARD OF EDUCATION;
CAROLYN BERNAL, in her individual
capacity and in her official capacity as
Superintendent of the North Wasco County
Public School District; and REBECCA
THISTLETHWAITE, DAWN RASMUSSEN,
DAVID JONES, JOHN NELSON, BRIAN
STEVENS, JOSE APARICIO, JUDY
RICHARDSON, all in their individual capacities
and in their capacities as members of the North
Wasco County School District Board of
Education,

                         Defendant(s)

---

Plaintiffs, Jennifer Rae Gunter, individually and as a natural parent of A.G.; Robert Jay

Schwartz, individually and as a natural parent of J.S.; Holly Lynn Gove, individually and as a

natural parent of M.G.; Chelsea Elizabeth Perritt, individually and as a natural parent of L.P.

(collectively, "plaintiffs") respectfully submit the Response to Defendants' "Opposition to

motion for Temporary Restraining Order and Preliminary Injunction."


## LR 7-2 CERTIFICATION

The undersigned hereby certifies that this Response complies with the applicable word

count limitation because it contains 10,461 including headings, footnotes, and quotations, but

excluding the caption, and signature block.

# INDEX

**OVERVIEW** …………………………………………………………………    4

**FACTS** ………..…………………………………………………………    4

**ARGUMENT** …………………………………………………………    9

1.  Legal Standards ...………………………………………………………….    9

2.  Plaintiff's Allegations ……...……………………………………………    10

3.  Plaintiffs Show Likelihood of Success ………………………………………….    14

4.  Without Counsel, Plaintiffs Cannot Represent the Interests of their minor children …    17

5.  Plaintiffs show the proposed injunction is beneficial to the Public ………………..    24

**CONCLUSION** ……………………………………………………………...    43


**STATUES**

ORS 431.180…………………………………………………………    14

ORS 339.288…………………………………………………………    14

**OVERVIEW**

The mask mandates imposed by the Defendants are not based on science and instead cause irreparable harm, Plaintiffs' have natural rights to represent their children, and the Defendants have an obligation based on the Oaths they took (not an adopted rule), to uphold the Constitution and the duties of their office.

**FACTS**

NWCSD did not consider, nor has been able to demonstrate they considered, parental concerns and Plaintiffs inalienable rights in adopting the mask mandate, and should provide the ability for students, and/or guardians on behalf of their children, to choose to opt-out based on physical, mental, emotional, or psychological health concerns, as well as on the basis of religious belief, moral conviction, or other fundamental rights retained by the people, the impairment of which may negatively impact such students physical, mental, emotional or psychological health. How would such a school district know if they do not have an open (questions and answers) dialogue with parents or take a survey of each individual child and family dynamic to understand each child's position within such district? NWCSD generally applied such mandate with no regard for individual parents or students following as defense counsel even stated "status quo" of OAR 333-019-1015, which is an adopted rule, nothing has been made law by the legislative branch. Masking children is not status quo, nor should it presumed to be.

Even the Centers of Disease Control and Prevention (CDC) Recognizes categories of people as **exempt** from the requirement to wear a mask, Including children underage two; firms with disability the abilities who cannot wear a mask, or cannot safely wear a mask, for reasons

related to the disability; and persons for whom wearing a mask would create a risk to workplace health, safety, or job duties (see "Guidance for Wearing Masks", "Who should or should not wear a mask" at https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover-guidance.html). Similarly, mask wearing can interfere with the learning and general well-being of school-aged children, related to their age and development; their disabilities, and physical and mental health attributes; and classroom health, safety, and productivity. Has NWCSD taken such care for their students by generalizing their actions? Those best suited and entitled to address individual needs for the physical, mental, and developmental well-being of their minor children, parents or guardians, in consultation with their Children's Health care provider as appropriate, should be afforded the ability to opt out of mask requirements on behalf of their children. Negligent applicability of status of all children/staff is the action taken by NWCSD.

To this end, most health care providers through information and belief recommend students be evaluated by a health care provider periodically and as necessary to identify health problems, with the potential for interfering with learning, including assessments of student's health and development status, vision, hearing, and mental health.

The scientific literature is not conclusive on the extent of the impact of masking on reducing the spread of viral infections. Through information and belief, plaintiffs understand that randomized control trials have not clearly been demonstrated on masking efficiency against respiratory viruses, and observational studies are inconclusive on whether mask use predicts lower infection rates, especially with respect to children.[1] Plaintiffs understands, however, that

---

[1] *See, e.g.,* Guerra, D. and Guerra, D., *Mask mandate and use efficacy for COVID-19 containment in US States*, MedRX, Aug. 7, 2021,

PAGE 5 - PLAINTIFFS' BRIEF IN SUPPORT OF TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

there is a body of literature, scientific as well as survey/anecdotal, on the negative health

consequences that some individuals, especially children, experience as a result of prolonged

mask wearing.[2]

Similarly, there is also substantial literature that persons who are forced to act contrary to

their religious beliefs or moral convictions may experience moral distress, and psychological and

https://www.medrxiv.org/content/10.1101/2021.05.18.21257385v2 ("Randomized control trials have not clearly demonstrated mask efficacy against respiratory viruses, and observational studies conflict on whether mask use predicts lower infection rates."). *Compare* CDC, *Science Brief: Community Use of Cloth Masks to Control the Spread of SARS-CoV-2*, last updated May 7, 2021, https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/masking- science-sars-cov2.html, last visited Aug. 30, 2021 (mask wearing reduces new infections, citing studies) *with* David Zweig, *The Science of Masking Kids at School Remains Uncertain*, New York Magazine, Aug. 20, 2021, https://nymag.com/intelligencer/2021/08/the-science-of-masking-kids-at- school-remains-uncertain.html (author reviewed the 17 studies cited in CDC's K-12 guidance of evidence that masks on students are effective, noting that none looked at student mask use in isolation from other mitigation measures or against a control, with some studies demonstrating that lack of masking correlated with low transmission and noting issue with presentation of one study published in CDC's MMWR). *See also* Xiao, J., Shiu, E., Gao, H., Wong, J. Y., Fong, M. W., Ryu, S., Cowling, B. J. (2020). *Nonpharmaceutical Measures for Pandemic Influenza in Nonhealthcare Settings—Personal Protective and Environmental Measures*. CDC, Emerging Infectious Diseases, 26(5), 967-975, https://doi.org/10.3201/eid2605.190994 (meta-analysis found that although mechanistic studies support potential effect of hand hygiene or face masks, evidence from 14 randomized controlled trials of such measures did not support a substantial effect on transmission of laboratory-confirmed influenza); Guerra, D. and Guerra, D. (not observing "association between mask mandates or use and reduced COVID-19 spread in US states").

[2] *See, e.g.,* Kisielinski, K. et al., *Is a Mask That Covers the Mouth and Nose Free From Undesirable Side Effects in Everyday Use and Free of Potential Hazards?*, Int. J. Environ. Res. Public Health 2021, 18, 4344, https://doi.org/10.3390/ijerph18084344 (scientific review of multiple studies revealed relevant adverse events over more than ten medical disciplines, including internal medicine, psychology, psychiatry, and pediatrics, finding statistically significant correlation in the quantitative analysis between the negative effects of blood-oxygen depletion and fatigue in mask wearers, and identifying what the authors called Mask-Induced Exhaustion Syndrome with symptoms including feeling of fatigue or exhaustion, decreased ability to concentrate, and decreased ability to think). *But see* CDC, Science Brief ("[r]esearch supports that mask wearing has no significant adverse health effects for wearers," citing studies mainly conducted with healthy research subjects).

emotional harm.[3]  This moral distress and the associated impact on an individual's psychological and emotional health could also arise when a person is **forced t**o **act contrary** to his or her **views** of his or her **fundamental rights**.[4]

Mask wearing has been shown to cause some children to suffer mental and emotional distress and issues.[5]  Mask wearing can also cause or aggravate physical conditions in some children, including interference with breathing related to asthma or other respiratory conditions or infections, or interference with the ability to seek classroom boards, screens, papers and desk surfaces, and **surrounding safety** conditions, especially for students wearing glasses. The scientific literature has identified, with respect to Pediatrics, diseases, or predispositions where masking may present significant risks, including respiratory diseases, cardiopulmonary diseases

---

[3] *See, e.g.,* Christy A. Rentmeester, *Moral Damage to Health Care Professionals and Trainees: Legalism and Other Consequences for Patients and Colleagues*, Journal of Medicine and Philosophy, 33: 27-43, 2008, p,37 ("moral distress is a sense of complicity in doing wrong. This sense of complicity does not come from uncertainty about what is right but from the experience that one's power to resist participation in doing wrong is severely restricted by one's work environment and from the experience that resisting participation in doing wrong is severely restricted by one's work environment and from the experience that resisting participation in doing wrong exposes one to harm."); Borhani et al., *The relationship between moral distress, professional stress, and intent to stay in the nursing profession*, J. Med. Ethics Hist. Med. 2014; 7:3.

[4] *Cf.* Kisielinski, K. et al. (masks impair the wearer's field of vision and inhibit other habitual actions, which can be perceived "as a permanent disturbance, obstruction, and restriction"; "[w]earing masks, thus, entails a feeling of deprivation of freedom and loss of autonomy and self-determination, which can lead to suppressed anger and subconscious constant distraction, especially as the wearing of masks is mostly dictated and ordered by others").

[5] *Id.* (noting a survey which showed masks can cause anxiety and stress reactions in children, an increase in psychosomatic and stress-related illnesses and depressive self-experience, reduced participation, social withdrawal, and lowered health-related selfcare); *see also* Carla Peeters, September 9, 2020, *Rapid response: Psychological, biological, and immunological risks for children and pupils makes long-term wearing of mouth masks difficult to maintain*, BMJ, https://www.bmj.com/content/370/bmj.m3021/rr-6.

PAGE 7 - PLAINTIFFS' BRIEF IN SUPPORT OF TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

(asthma comma bronchitis comma cystic fibrosis comma congenital heart disease comma emphysema), neuromuscular disease, and epilepsy.[6] In addition, mask wearing can cause decreased ability to think and to concentrate in some children, with potential implications for their cognitive development.[7]

For all of these reasons and more above a mask mandate policy cannot possibly serve to protect and further the physical mental and emotional health of students or parents who may be negatively impacted by a masking requirement. Safety recommendations and personal choices in response to a global pandemic are invaluable, but arbitrary mandates can place more detrimental stress or have other adverse health impacts on some student's families and parents, unless they have the ability to opt out as necessary for free breathing souls/beings see fit. Plaintiffs are not so aggressively asking for a one size fits all solution in their school district but rather they are asking to reserve the rights that we're afforded naturally by and thru birth to the parents, as well as courts recognize all reserved constitutional rights given to all living souls upon such birth, of all living beings born thus far. Proclamation of this emergency is necessary because no other act can be taken to avert this imminent peril to the irreparable harm constitutionally, health safety, and well-being of NWCSD youth and parental rights.

_____

[6] Kisielinski, K. et al. These conditions tend to be ones with respect to which individuals would be excluded from research studies. *See, e.g.,* Lubrano, R., Bloise, S., Testa, A., et al. *Assessment of Respiratory Function in Infants and Young Children Wearing Face Masks During the COVID-19 Pandemic.* JAMA Netw Open. Mar 2 2021;4(3):e210414. doi:10.1001/jamanetworkopen.2021.0414, (cited in CDC, Science Brief at note 64) (noting the exclusion from study of infants and young children with lung or cardiac disease, neuromuscular disorders and those with medications that could be associated with changes in the parameters examined).

[7] *See, e.g.,* Kisielinski, K. et al.; *see also* Guerra, D. and Guerra, D. (noting some risks of mask wearing, including that by obscuring nonverbal communication, masks interfere with social learning in children, and research that masks decrease cognitive precision).

**ARGUMENT**

1.    **Legal Standards**

For a preliminary injunction to be granted, the plaintiff will need to demonstrate 4

elements:

a.    Likely hood of success – Plaintiff's has found and cited extensive scientific

research on mask wearing and the health hazards they pose.  Additionally, Plaintiff has

obtained a sworn Declaration from Stephen E. Petty, an expert in the field of Industrial

Hygiene (and expert witness in multiple court cases) who has testified as the futility and

danger caused by an individual wearing a mask in order to avoid transmitting or

becoming infected with Covid-19.  Defendants do **not** cite any science, instead they are

monetarily incentivized to place masks on the children based on "CDC

recommendations" in order to obtain Federal Funding under the ARP/ESSER programs.

b.    Irreparable harm in the absence of injunctive relief

An injunction will help prevent damages which are cumulative, irreparable, and for

which damages furnish an entirely inadequate remedy or redress.  One cannot put a

remedy on degraded health, drops in oxygen, increased carbon dioxide, or the mental and

physical effects of wearing a mask.  Negligent infliction of emotional distress endured teo

loss of such inalienable rights.

c.    Balance of equities tips in their favor

Plaintiffs can show, via the science, that the effects of mask wearing **greatly** outweigh

the purported health benefits of wearing a mask to avoid spreading Covid-19.  States

across this country, like Florida who has a population of 21+ million souls have not put

their children and citizens in masks and have proven it did not drive community transmission of Covid-19.

d.      Injunction is in the public interest - The masking requirement causes immediate and irreparable harm to students, staff, and the community.  The science, based on the experts and various studies denotes hazards too great to list.  Some of which are unknown at this time given the extensive amount of time people are wearing them and re-breathing diminished oxygen levels.  Harm will only be known as time passes and cumulative issues begin to appear. Are such extreme risks worth undecided benefits?

## 2.    Plaintiffs' Allegations

a.)     In 2003, the Centers for Disease Control (CDC) issued Guidelines for Environmental Control in Health-Care Facilities, which provided a comprehensive formula for airborne- contaminant removal.

(https://www.cdc.gov/infectioncontrol/guidelines/environmental/index.html)

b.)     In November 2010, the National Institute for Occupational Safety and Health (NIOSH), a division of the CDC, announced its nationwide "Prevention Through Design" (PtD) initiative. The purpose of the PtD initiative is to "prevent or reduce occupationally related injuries, illnesses, fatalities, and exposures by including prevention considerations in all designs that affect individuals in the occupational environment." "Fundamental" to PtD is the effort to "accurately assess risk through the application of a hierarchy of controls." (https://www.cdc.gov/niosh/topics/hierarchy/default.html)

c.)     On September 9, 2020, the American Industrial Hygiene Association (AIHA) issued Version 4 of its "Guidance Reducing the Risk of COVID-19 using Engineering Controls," applying the CDC/NIOSH Hierarchy of Controls to COVID-19. Using the

applicable CDC formula for airborne-contaminant removal, the AIHA Guidance found that HVAC systems enabling six (6) or more air changes per hour (ACH) "significantly reduce[d] the spread of infectious airborne diseases" such as COVID-19 a rate (99%+) superior to all other PPE controls, thereby representing the single most effective pandemic control measure known to science, and fully consistent with CDC recommendations and the NIOSH PtD national initiative (**Complaint Exhibit V**).

d.)     On March 8, 2021, Oregon Ready Safe Learners issued its School Guidance Checklist, on the form established by NWCSD. While the Checklist contains a number of details about COVID-19 response and mitigation plans, it makes no mention of ventilation protocols, other Engineering Controls, or any applicable issues applying the Hierarchy of Controls to school buildings, or the public health impact thereof. (**Complaint Exhibit N**) (Publicly available at https://www.oregon.gov/ode/students-and-family/healthsafety/documents/ready%20schools%20safe%20learners%202020-21%20guidance.pdf).

e.)     Based on information and belief, Oregon Schools (including, but not limited, to the NWCSD) have failed to comply with the interim guidance for Ventilation, and as have such failure, there have been no comprehensive evaluations of NWCSD buildings to evaluate potential ventilation control measures, let alone their relative impact on the corresponding necessity for lower- level control measures. This failure to perform required ministerial duties additionally contradicts that applicable Hierarchy of Control principles recommended by CDC guidance and outlined in detail in the AIHA Guidance, and also pose grave harm to plaintiffs, its members and all public-school students, families and staff.

f.)    Because of defendants' failure to provide the requisite regulatory and legal clarification to enable effective compliance and a science- based pandemic response, the public has no information on how seemingly conflicting "guidance" Recommendations should be addressed.

g.)    Based on applicable law and guidance, including but not limited to the CDC's Hierarchy of Controls and the OSHAS ETS, Defendants must evaluate the availability of engineering controls, including, but not limited to, temporary ventilation measures to combat the spread of COVID-19 in defendants' workplaces, namely NWCSD And every classroom and occupied building therein.

h.)    Under applicable public health guidance, access to outdoor or clean air is the single most significant variable impacting public safety and has a demonstrated effectiveness exceeding all other control measures in the applicable guidance. (AIHA Guidance, supra, p.4) See also American Conference of Government Industrial Hygienists (ACGIH), Industrial Ventilation Committee, "White Paper on Ventilation for Industrial Settings During the Covid-19 Pandemic", August 2020 (**See Exhibit 2**)

i.)    Based on information and belief, defendants have failed to discharge their threshold ministerial duties regarding the investigation and implementation of ventilation-based protocols and other applicable engineering controls consistent with the PtD (Prevention through Design) hierarchy of controls.

j.)    NWCSD Have enforced the challenge guidance in a mandatory capacity as a "prescriptive standard" against plaintiffs and its members, **contrary** to **law** and **science.**

k.)     NWCSD and their council have failed to reference any "study or other empirical data" demonstrating the necessity of enforcing the challenge guidance against plaintiffs, let alone demonstrating the necessity "by substantial evidence".

l.)     NWCSD have a clear legal obligation and ministerial duty to comply with the constitutional principles of due process, prior to the pending and threatened enforcement of the challenged guidance against Plaintiffs and its members.

m.)     Additional relevant ministerial duties imposed on plaintiffs by mandates to take "all available measures" to improve ventilation in buildings, which is known to be one of the most effective means of preventing the spread of COVID-19. By information and belief, NWCSD has not taken any such action.

n.)     To date, as stated and above, respondents have failed or refused to perform their required ministerial duties as stated above and thereby have directly caused harm and damages to plaintiffs as a proximate result of such failure. Plaintiffs' have no plain, speedy, and adequate remedy at law to address the violations of their constitutional and statutory rights under color of law.

o.)     Defendants lacked the statutory authority to enforce, or threaten to enforce, the challenged guidance in a mandatory capacity against plaintiffs and its members.

p.)     The **ambiguity** regarding whether "guidance" is "recommended" is pervasive and has been **exploited** by the actions of defendants.

q.)     NWCSD have exceeded lawful authority in pursuing and continuing enforcement of the challenged guidance without considering the factors and performing the minimum duties as required, including but not limited to, applicable ventilation protection under the hierarchy of controls and applicable regulations and law; endangering minors by

restraining their breathing and **willfully** dropping minors oxygen intake with such prescribed implementation and complicity to follow the masking guideline protocol for securing federal funding. (Also see **Complaint Exhibit L**, NWCSD **declining** plaintiffs request of an industrial hygienist test line 6.)

r.)    Pennsylvania Supreme Court throws out mask mandate for schools under Case No. 83 MAP 2021 in Parents v. Acting Secretary of the Pennsylvania Department of Health (December 10, 2021).  The court ruled that the masking mandate, which also applies to child care facilities, is not valid because it was imposed by Democratic Gov. Tom Wolf's acting health secretary without legal authorization.

**3.    Plaintiffs Show a Likelihood of Success**

a.)    Defendants issued the masking guideline without Parental consideration or due process that deem a child in grades K through 12 is infectious While it seems there is no evidence that defendants considered the underlying data, science, and evidence that fails to justify issuing mask mandates at this time that have not been proven effective to stop the spread of COVID within school age children. Similarly, defendants imposed the mask mandates on school children, ignoring that those children are less likely to get COVID-19, less likely to also get seriously ill if they do get it, and are less likely to transmit the disease, while at the same time, suffering disproportionately from the masking requirement proving unequitable results.

b.)    Defendants mask mandates are a continuation of series of arbitrary, capricious, unlawful, and unconstitutional COVID-19 related restrictions. There is no reason to allow such orders to continue based on an adopted rule as is breaks the law by superseding ORS 339.288 (Prohibitions on restraints that impede breathing) and ORS 431.180 (Interference

with individual's selection of health care treatment prohibited). Nor is there any such reason that defendants should not be looking into science that does not make any form of rational consideration or regard for personal and parental sovereignty. The ends do not justify the means the risks of the unknown are far too great to plaintiffs' cand their children.

c.)      Restrictions cannot be unconstitutional, unlawful, unreasonable, arbitrary, or capricious and should not be allowed to continue at the irreparable harm to plaintiffs and their minor children, when such measures fail to consider an important part of the problem it is addressing, and when it fails to consider least restrictive alternatives before infringing on citizens liberty. (i.e., parental choices and discretion based on masking, not a one size fits all approach.)  The belief of law via an adoptive rule NWCSD board took oath of office to defend our constitution, to claim immunity and not understanding of certain types of generally applicable laws with no authority is simply not good enough for NWCSD parents who have entrusted to them with the educational needs of their children K through 12. NWCSD was not entrusted for healthcare practices to district children. To claim authority based on adoptive rules and temporary standards far exceeds the statutory and constitutional authority to usurp the rights of parents within the NWCSD and assume children's health needs.

**d.)**      The plaintiffs challenge the validity of the mask mandate and seeks a declaration that they are unreasonable, arbitrary and capricious along with violating the supreme constitutional authority that resides within the parents along with **negligent infliction of emotional distress to all plaintiff parties and have severe consequences.**

e.)    The masking requirement for schoolchildren K through 12 is unreasonable, such requirement is applied in general assumption each child is infectious daily, it is arbitrary, and capricious. Schoolchildren are generally not at risk of serious illness even if they get COVID-19 thus reducing the need for harsher nonpharmaceutical intervention. See, e.g., Marty Makary. Opinion, The Flimsy Evidence Behind the CDC, s Push to Vaccinate Children, Wall St. J. (July 19,2021) ("Our report found mortality rate of zero among children without a pre-existing medical condition such as leukemia.") on information and belief, defendants **failed** to consider that fact in deciding to promulgate the mask mandates as well as all the considered side effects that K through 12 students may suffer.

f.)    On information and belief, defendants failed to consider several important factors relating to masking for schoolchildren:

1)    To start, the mask mandates failed to account for the fact that children are less likely to contract COVID-19 and, if they do contract it, display less severe symptoms. See, e.g., Nicholas G. Davies, Age-Dependent Effects in the Transmission and Control of Covid -19 Epidemics, 26 NATURE MED. 1205, 1205 (2020) (concluding that susceptibility of infection in those under twenty is half that for those over twenty and that those under 20 do not manifest clinical symptoms as often.) that suggests that children are also less likely to transmit the virus see id. At 1208-09, which appears to be the consensus position.[8]  There is

---

[8] See, e.g. Eun Young Cho et al., Letter to the Editor, Interpreting Transmissibility of COVID-19 in Children, 26 EMERGING INFECTIOUS DISEASES 3106,   3107  (2020) (interpreting data); AAMC (Nov. 5, 2020), https://bit.ly/3kQDvyG ("Several studies have found that children transmit the virus, but perhaps not as often as adults, especially in younger age groups. It's not clear why."); Eli Somekh et al., The Role of Children in the Dynamics of Intra Family Coronavirus 2019 Spread in Desly Populated Areas, 39 PEDIATRICS INFECTIOUS DISEASE

thus a much less pressing need for masking among young children. That includes

within schools. One study found "an infection rate of 0.13% among students and

0.24% among staff" after analyzing in- school infection data from over 47 states.

Patrick Boyle, Kids, School, and COVID-19: What We Know- and What we

Don't, aamc (Nov. 5, 2020). rather, schools are more likely to be affected by

COVID-19 rates in the community than B   super- spreader event. See id.[9]

**4.      Without counsel, plaintiffs cannot represent the interests of their minor children.**

a.)      Plaintiffs reserve their natural rights as parents as well as individual rights

protected under the US Constitution which remains the supreme law of the land as a

living document of our nation.

b.)      Our God given rights are whatever we define them as, as long as they do not

interfere with someone else's. The preamble of the Declaration of Independence

recorded, life, liberty, property, and pursuit of happiness, by our creator. All the founding

documents put God first, then man, then government. Even in its smallest forms (school

boards).

c.)      Furthermore, by claiming future rightful damage for our offspring as we have

created them within and through the womb, by DNA, through legal marriage and or

---

J. 202, 203-4 (2020) (noting study indicating that children are less likely to get COVID-19 and finding similar results).

[9] see also e.g., CDC, Science Brief: Transmission of SARS -CoV-2 IN K-12 Schools and Early Care and Education Programs-Updated  (updated July 9, 2021), https://bit.ly/3rxQeaR; Questions and Answers on COVID-19: Children aged 1- 18 years and the Role of Schools Settings, European Centre for Disease Prevention & Control (updated Jan. 25 2021), https://bit.ly/3j3yHDJ. But see Zoe Hyde, Perspectives, COVID-19 ( Children and Schools: Overlooked and at Risk, 213 Med. J. AUSTL. 444, 446 (2020) (arguing that schools play a bigger role in transmission than assumed, but conceding that '[w]hether young and older children transmit the virus similarly is unknown an requires urgent clarification").

through consent by joint acts between two parties. Which our offspring has endured negligent infliction of emotional distress along with their parents by such constitutional rights being usurped and disregarded without proper cause or process of proving parents unfit.

d.)      Requiring parents, a suffering of a financial disability to pay for a lawyer is unjust and not in the interest of the public when just cause has been presented. The Americans with Disabilities Act (ADA) became law in 1990. The ADA is a civil rights law that prohibits discrimination against individuals with disabilities in **"all areas"** of public life, including jobs, schools, transportations, and all public and private places that are open to the general public. Courts are made for the people by the people. The absurd result of such a position would be that Oregonian parents would not be able to represent their minor children pro se and instead would have to bear the often-exorbitant expense of hiring an attorney to represent the children. Therefore, although parents in Oregon have the financial obligations for and are vicariously liable for the actions of their minor children, they are prohibited from protecting the legal interests of the minor children to which they are financially and vicariously responsible. Such a scenario is devoid of any modicum of rationality. Unconstitutional Mandates are constantly being imposed on the people; law firms are overflowing with cases. Unemployment is at all-time high, single parents are a financial disadvantage of extra funding. Plaintiffs have sought council prior and have either been declined representation, presented with extreme retainer fees, and or never getting a reply to messages left for representation. But as counsel stated himself our filing wasn't "fast enough" nor was finding council acceptable" fast enough" hence the duties, desperation, despair, and urgency of taking on the case ourselves to represent the

**abuse, causes, and violations brought forth before the court**. Plaintiffs have **over** 1,800 hours of dedication thus far into their case which equates to the standard lawyer fee of $240 per hour of a total $432,000 monetarily which is an exorbitant amount for average American families a large majority of middle-class Oregonian's suffered financial hardships due to statewide shutdowns and unemployment.

e.)    **Rule 17. Plaintiff and Defendant; Capacity; Public Officers**

(c) Minor or Incompetent Person.

(1) *With a Representative*. The following representatives may sue or defend on behalf of a minor or an incompetent person:

(A) a general guardian;

(B) a committee;

(C) a conservator; or

(D) a like fiduciary.

(2) *Without a Representative*. A minor or an incompetent person who does not have a duly appointed representative may sue by a next friend or by guardian ad litem. The court must appoint guardian ad litem—or issue another appropriate order—to protect a minor or incompetent person who is unrepresented in an action.

f.)    Irreparable Harm and depravation of rights is caused to minor children when their ability to pursue legal action in court is denied arbitrarily, based only on president, and delaying the ability to appear without an attorney until a minor reaches the age of

majority is not fair compensation for the denied claim, especially if harm is caused in the interim.

g.)    In the instant case, harm caused to the child by the school district falls on the parent as a financial burden, as well as "negligent infliction of emotional distress" to all plaintiffs. Knowledge of the matters at hand **is greater** for a parent than an attorney with whom the child has never met and who knows nothing about the situation or parties involved until hired for a case which causes undue financial burden and discrimination to the parent to represent their minor child, with such burden slows the process or seeking relief.

h.)    Innocent (competent) until proven guilty (incompetent):

1)    There undoubtably should be a presumption of capability on the part of minor's parents to represent their minor children in courts and less proven otherwise.

2)    As long as the **rules** of the court are followed in the initial and subsequent filings, and as long as parent representatives are meeting all court-required deadlines, there should be no biased formed jointly against them by the courts or by defendant's counsel.

3)    Are parents who have met all requirements thus far for a lawful lawsuit, but are not attorneys by man's general descriptions to be denied the right to represent their minor children in court, if they are more capable at practicing law than many attorneys who would represent the minor child less well? How is this determined by the court? If not determined, the child's interests are not well served by requiring lower quality representation just because the court or

defendant's counsel may doubt without due process that plaintiffs have no understanding of legalese or their child's needs. Plaintiffs also believe this is a violation of their First Amendment right and to address the courts of their grievances.

4)      One case, Jie Lin v. Ashcroft, 377 F 3d (9th cir. 2004) include such poor representation by counsel as a key component of the appeal.

**5)**      There is an additional cost to access courts through the requirement of an attorney; the constitution protects for all people the right to redress grievances, **not only** for the wealthy who can afford attorneys. the Second Circuit noted this concern in **Tindall v. Poultney**

**6)**      **High School Dist.,** 414 F 3d 281 (2nd Cir. 2005), where a lawyer could not be found for lack of funds despite plaintiffs with winning case is being able to recover attorney's fees. (**Essentially the case was decided by the attorneys declining to take the case because they wouldn't risk their back-ended compensation, as opposed to being decided in a court of law; perhaps the decision would have been unfavorable to the plaintiffs following a trial, but the right to pursue claims should not be denied based on arbitrary precedent, nor reserved to certain citizens and not others.)**

7)      How is a minor child to be represented in a scenario where the courts deny parental representation rights and all attorneys are forbidden or prohibited from accepting a specific **type** of case (either explicitly or tactically through peer messaging and public opinion)? In such a case, access to the courts is lost for the child and the parents. Irreparable harm will continue and be irrevocable through

lost time by allowing such abuse to minors and parents by not being addressed by the courts quickly and actions to parents and child's harm be allowed to continue

8)      Courts under the constitution were not meant for attorneys, but for the average person to find redress of grievances. It is the plaintiff's sole belief the courts were made for the people by the people to find such redress of our grievances of irreparable harm to their minor children by being placed in a restraint that impedes their breathing, drops oxygen levels for up to 8 hours a day, including all the listed violations and complaints within original complaint filed on November 16th, 2021, and TRO along with the irreparable harm of usurping parental rights with negligent infliction of emotional distress without due process and proper science to justify NWCSD actions.

**9)**      Amendment to the United States constitution states: "the enumeration in the constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." Nothing in the United States Constitution states or even suggests that parents of minor children do not have the right to seek redress in the courts in order to protect the health and safety of their children, and thus, plaintiffs retain their rights to protect [his / her] minor child, plaintiffs Parental rights have **NOT** been surrendered voluntarily.  Laws or interpretations therefore which restrict or deny this right not disallowed to parents by the United States Constitution must be considered repugnant, capricious to the constitution and therefore held to be **void.**

10)      From **Marbury v. Madison,** 5 U.S. 137, 1803 at 138: "certainly all those who framed written constitutions template them as forming the fundamental an

paramount law of the nation, and consequently the theory of every such government must be, that an act of the legislature repugnant to the constitution is void."; and at 163: "Thus, that particular phraseology of the constitution of the United States confirms and strengthens the principle, supposed to the essential to all written constitutions, that a law repugnant to the constitution is void, and that courts, as well as other departments, are bound by that instrument." "In declaring what shall be the supreme law of the land, the constitution itself is first mentioned; and not the laws of the United States generally, but those that which shall be made in pursuance of the constitution, have that rank." "All law (rules and practices) which are repugnant to the constitution are VOID."  since the 14th amendment to the constitution States, "NO State" Jurisdiction) shall make or enforce any law which shall abridge the rights privileges and immunities of citizens of the United States nor deprive any citizen of life liberty or property without due process of law or equal protection under the law this renders judicial immunity unconstitutional.

11)     **Sims v. Aherns,** 271 SW 720 (1925) "The practice of law is an occupation of common right." "Because of what appears to be lawful command on the surface, many citizens because of their respect for what appears to be law, are **cunningly coerced** into waiving their rights due to ignorance."  Plaintiffs do not voluntarily surrender any inalienable rights nor parental rights

12)     As in, Hale v. Henkel 201 U.S. 43 at 89 (1906) Hale v. Hinkle was decided by the United States Supreme Court in 1906. The opinion of the court states: "The "individual" may stand upon "his Constitutional rights" as a

CITIZEN. He is entitled to carry on his "private" business in his own way. "His power to contract is unlimited." he owes no duty to the state or to his neighbors to divulge his business, or to open his doors to an investigation, so far as it may tend to incriminate him. He owes no duty to the state, since he receives nothing there from, beyond the protection of his life and property. "His rights" are such as "existed" bye Law of the Land (Common Law) "long antecedent", and "in accordance with the Constitution," "He owes nothing" to the public so long as he does not trespass upon their rights." Hale v. Henkel is binding on all the courts of the United States of America until another Supreme Court case says it isn't. No other Supreme Court case has ever overturned Hale v. Henkel none of the various issues of Hale V. Hankel has ever been overruled since 1906, Hale v. Henkel has been cited by the federal and state appellate court system over 1600 times. In nearly every instance when a case is cited it has an impact on precedent authority of the cited case. Compared with other previously decided Supreme Court cases, no other case has surpassed Hale V. Hinkle in the number of times it has been cited by the courts.

**13)**    "The rights of the individuals are restricted only to the extent that they have been voluntarily surrendered by the citizenship to the agencies of government." Plaintiffs have not voluntarily surrendered their rights as guardians nor their rights of their minor children, compliance based on coercion is not consent and unlawful, requiring parents to go against their religious beliefs, health beliefs, and natural cores of daily rights as free living souls is repugnant. **(See Exhibit 3)**

**5.**      **Plaintiffs show the proposed injunction is beneficial to Public**

a.)    Public Interest

1.)    Given the indisputable evidence we now have regarding the lack of efficacy and significant harm caused by long term mask usage it is very much surprising to me that counsel for NWCSD so aggressively fights to dismiss this case. Does NWCSD not want to find out if children are in danger due to this mask mandate? It seems that the bottom line for at least one law firm and school district is that money comes before the health of our children.

2.)    I direct the courts to what is set forth below to fully understand why continuing with a mask mandate creates a danger to all children in the NWCSD and is most indeed in the public's interest.

3.)    Eight such States have banned mask mandates in K-12 schools (Arizona, Arkansas, Iowa, Oklahoma, Florida, South Carolina, TX and Utah) while 25 states have no policy regarding mask and or facial covering.

4.)    School mask mandates, however, are currently encouraged by the CDC. See CDC guidance for COVID-19 prevention in K-12 schools hey Siri show me square however the current currently encouraged by the CDC hey Siri show me the CDC guidance for COVID-19 prevention in K through 12 schools (updated November 5, 2021) ("recommends indoor masking for all individuals aged 2 years and older, including students, teachers, staff, and visitors, regardless of vaccination status.") (Publicly available on

https://www.cdc.gov/coronavirus/2019-ncov/community/scools-childcare/k-12-

guidance.html ). In other words, children-who are those most vulnerable to long

term mask usage are the ones who are now forced to wear them.

**5.)**      Specifically, NWCSD's position on the issue of school mask safety and

efficacy contrast with schools in Florida-**which clearly demonstrates that there**

**is sufficiently a difference of opinion on the topic requiring defendants' step**

**back and let parents decide.**

**6.)**      Compared to what was done here in Oregon, other states do 'follow the

science" and understand that the use of masks and other medical choices must be

made by parents and not government. See state of Florida office of governor

executive order number 21-175, filed July 30th, 2021 **(See Exhibit 1)**.

**WHEREAS**, given the historical data on COVJD-19 and the ongoing debate over whether

masks are more harmful than beneficial to children and to school environments in

general, we should protect the freedoms and statutory rights of students and parents by

resting with the parents the decision whether their children should wear masks in

school; and

**WHEREAS**, we should equally and uniformly protect the freedoms and rights of students

and parents across the state.

**7.)**      NWCSD would have the court believed that wearing masks is no big deal

and students should just comply "for the greater good" -a perspective straight out

of Orwell's 1984. Facts are indisputable truth. Facts are not subjective,

measurable or up for discussion. As Merriam-Webster defines facts. 1**:** something

that truly exists or happens: something that has actual existence 2**:** a true piece

of information.

It is important to first take into consideration that the three-ply surgical mask routinely used by students are very much 'medical devices" specifically the most used masks are classified by the FDA as medical devices and schools are not forced on anyone without adequate informed consent.  see FDA medical device database that shows "surgical masks" as a Class 2 medical device. (publicly available at

https://www.accessdata.fda.gov./scripts/cdrh/cfdocs/cfPCD/classification.cfm?id=2909  the FDA designation of surgical "masks as medical" is recognized by the Occupational Safety and Health Administration: "surgical masks are typically cleared by the US food and drug administration as medical devices."  See "Protecting workers: Guidance on Mitigating and preventing the spread of COVID-19 in the workplace", footnote 1 (publicly available at

https://www.osha.gov/coronavirus/safework ).

8.)	The parents of Oregon schoolchildren should always have a choice in what medical device their children use-especially given the real potential harm and lack of efficacy with mask usage. To that end, after the release of numerous studies and expert analysis, in October 21, there should no longer be any doubt that the 3-ply masks used by most are **neither safe** to the wears nor **effective at stopping** the transmission of SARS Co V2. It is obvious that none of this information has been viewed by NWCSD given their legal counsel's filing with this court so aggressively argue that mandating masks is something that should be continued and in the public's interest and within the realm of the law.

9.)    The most obvious physical harm caused to mask wearers especially those wearing masks all day long during school, is a pronounced increase in $CO_2$ from prolonged mask usage. Researchers have analyzed the $CO_2$ content of inhaled air among those wearing commonly-used masks as well as wearing no mask and determined that $CO_2$ inhaled air under standard 3 ply surgical masks led to "impairments attributable to hypercapnia," which is the buildup of $CO_2$ in the blood. Not surprisingly, researchers advise: "The Clinical implications of elevated $CO_2$ levels with long term use of face masks need further studies. "See Rhee, MSM., et al., "Carbon dioxide increases with face mask but remains below short-term NIOSH limits, Dis. (April 16, 2021) (publicly available at

https://pubmed.ncbi.nlm.nih.gov/33858372/)

10.)    Furthermore, plaintiffs own $CO_2$ test on minor daughter measuring the $CO_2$ within the masks that are prescribed by NWCSD and required Five days a week from approx. 7:30 am -2:55 pm. **In case and fact oxygen level is dropped and co2 raised 5 times allowable amount. (**see link publicly available at

**https://youtube.com/channel/UCoXkCUshCYG6SeahMBtRPwg .)**

11.)    The adverse impact of $CO_2$ on **mental performance,** however, is well documented and needs no additional studies. The particular harm obviously has great importance when it comes to a school mask. See e.g., Sayers, JA., et al., "effects of carbon dioxide on mental performance," J Appl Physiol (July 1, 1987) (publicly available at https://pubmed.ncbi.nlm.nih.gov/3114218/).

12.)    Furthermore, harm to a child's growing brain from $CO_2$ toxins **has not ye**t been studied in **modern day history**. The **'risks'** of such generally applied

actions by the NWCSD simply and clearly outweigh the **benefits not yet proven**. By restricting nose and mouth with mask coverings and inhibiting free fresh air and elevating $CO_2$ levels in children that is inhaled repeatedly and continually for schooldays, mask wearing simply cannot be the acceptable new status quo for children.

13.)     These health risks should not come as a surprise given that over fifteen years ago it was realized that the use of raspatory masks "[i]n the event of an influenza pandemic" would cause large numbers of healthcare workers to wear respirator masks "for prolonged periods and problems with hypercapnia might reduce the tolerability of these devices." See Fletcher, SJ et al., "Carbon dioxide re-breathing with close fitting face respirator masks," Journal of the Association of Anesthetists (August 9, 2006) (Publicly available at

https://associationofanaesthetists-publications.onlinelibrary.wiley.com/doi/full/10.1111/j.1365-2044.2006.04767.x

.)

**14.)**     In 2008, there was a similar study done using the same of sort 3 ply surgical mask currently prevalent in the NWCSD school system. The study demonstrated "surgical masks induced deoxygenation during major surgery" - providing for a decrease in the oxygen saturation of arterial pulsations **after only an hour of surgery.** See Beder, A., et al., "preliminary report on surgical masks induced deoxygenation during major surgery,' Neurocirugia (Astur) April 19th, 2008) (publicly available at https://pubmed.ncbi.nlm.nih.gov/18500410/ ).

**15.)**    There are also less obvious ways prolonged use of mask can cause physical harm-all of which were **not** likely considered when NWCSD issued its mask mandate. For example, microbes from a child's mouth, known as oral commensals, frequently enter the lungs, and **wearing a mask will accelerate this process**. it has been determined that "oral commensals in the lungs could drive an IL-17-type inflammation and **influence lung cancer progression**. See "lung Microbiome May affect Lung Cancer Pathogenesis and prognosis," American Association for Cancer Research (November 11, 2020) (publicly available at https://www.aacr.org/about-the-aarc/newsroom/news-releases/the-lung-microbiome-may-affect-lung-cancer-pathogenesis-and-prognosis/ ).

**16.)**    Another issue that has been rarely discussed and likely not considered by the NWCSD board that when issuing its various mask mandates is the **fact** that the disposable 3 ply surgical mask commonly used **also release potentially harmful microfibers directly into the body.** A UK universities May 5th, 2021, news release regarding a study exploring these dangerous state masks "still are essential in ending the pandemic" yet in the **same** release recognizes the dangers of mask usage: "The findings Reveal significant levels of pollutants in **all the masks** tested-with micro/ nano particles and heavy metals released into the water during all tests. Researchers conclude this will have a substantial environmental impact and, in addition, raises the question of the potential damage to public health-warning that repeated exposure could be hazardous as the substances found have known links to cell death, genotoxicity and cancer formation. 'see Nano plastics and other harmful Pollutants found within disposable face mask,

"Swansea University (May 5, 20021) Publicly available at

https://www.swansea.ac.uk/press-office/news-events/news/2021/05/nanoplastics-and-other-harmful-pollutants-found-within-disposable-face-masks.php ). The

reference survey concludes: **"The toxicity of some of the chemicals found in the postulated risks of the rest of the present particles and molecules, raises the question of whether DPFs [disposable face masks] are safe to be used on a daily basis."** see Sullivan, GL et al., "An investigation into the leaching of micro and nanoparticles and chemical pollutants from disposable face masks-linked to the COVID-19 pandemic, "Water Research (May 15, 2021) (publicly viewed at

https://www.sciencedirect.com/science/article/abs/pii/S0043135421002311# )

(emphasis added).

17.)    None of the masks that are currently required in generality by NWCSD **undergo rigorous quality control testing**.  Most face coverings used today are mass produced in China-the type of masks that release aerodynamic nano-particulate fibers which can be inhaled deeply into the lungs, reaching the gas exchange surface is of the alveoli. More to the point, these respirable nanofibers and **share the same** aerodynamics once inhaled. As a result, they have the **same** potential to cause the **same** type of harm caused by asbestos fibers, creating conditions for formation of sensitization (sore throat, cough, alveolitis, asthma) scar tissue Fibrosis) and cancer (lung cancer or mesothelioma) with the serious risk of short-term and long-term harm. The declaration of Steven Petty discuss these issues (**Complaint Exhibit AC**, **i,ii,iii,iv,v,vi,vii,viii**) In fact, the level of authority in this domain is **very deep** and was likely not reviewed by NWCSD for

consideration or **not** reviewed at any point in time. see Kobayashi, H., et al.,
"Diffuse lung disease caused by cotton fibre inhalation but distinct from
byssinosis, " BMJ Thorax (November 24, 2004) (Publicly available at
https://thorax.bmj.com/content/59/12/1095 ): Lai, PS., et al., "Long team
respiratory health effects in textile workers," Current Opinion in Pulmonary
Medicine (March 19,2013) (Publicly available at
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3725301); Pimentel, JC., et al.,
"Respiratory disease caused by synthetic fibres: a new occupational disease,"
Thorax (1975)) (Publicly available at
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC470268/pdf/thorax00140-
0084.pdf);  Wuyts, WA., et al., "The pathogenesis of pulmonary fibrosis: a
moving target," European Respiratory Journal (May 2013) (Publics available at
https://erj.ersjournals.com/content/41/5/1207 ; Obersdorster, G., et al.,
"Nanotoxicology: an emerging discipline evolving from studies of ultrafine
particles," Environmental Heath Perspectives (March 22, 2005) (Publicly
available at https://www.ncbi.nlm.nih.gov/pmcarticles/PMC2322933/ ).

18.)     In addition to the above major health risks, research has shown that **masks
adversely impact** respiratory function; mask trap exhaled disease particles in the
mouth/masks, increasing infectious load and increasing disease potential; masks
may give a false sense of security-having users forgo more effective practices
such as frequent hand washing or being in a well- ventilated room-in direct
contradiction of WHO guidance; masks lower oxygen levels in the blood so
SARS Co V2 can enter cells more easily (which happens when arterial oxygen

levels decline) so wearing a mask actually increases COVID-19 severity and increases the risk of contracting COVID-19 as well as other respiratory infections; masks compromise communications and reduce social distancing; mask worn imperfectly are dangerous and will collect an colonize viruses, bacteria, mold, and increase where's exposure to cancer causing fibre; masks are not needed for those without symptoms given contact tracing studies show that asymptomatic carrier transmission is very rare; an masks are dangerous an contraindicated for a large number of people with pre-existing medical conditions and disabilities, as well as to a minor child still growing brain that does not mature until the age of 25. This and all above stated information is very much in the realm of public interest.

19.)    Furthermore, a recent article published by the international Journal of Environmental Research and Public Health and such study was shared with all defendants, within that study it has been discovered that excess mask usage causes a new disease "Mask-Induced Exhaustion Syndrome". See Kisienlinski, K., et al., "Is Mask That Covers the Mouth and Nose Free from Undesirable Side Effects in Everyday Use and Free of Potential Hazards?" International journal of Environmental Research and Public Health (April 20, 2021) (Publicly available at https://www.mdpi.com/1660-4601/18/8/4344).

20.)    As for the "mental harm" caused by mask usage, this Court only needs to acknowledge that children are social creatures who yearn for social contact that is unmuzzled and not hampered in a way that makes expressions blank and inhumane-especially at an early age when children often learn by seeing facial expressions. Future studies demonstrating the adverse psychological impact of

mask wearing will likely cover reams of volumes. It is doubtful that the NWCSD examined the suicide rate since masks and their other "protective" measures were forced on school district children. See Ganesan, B., et al., "Impact of Coronavirus Disease 2019 (Covid-19) Outbreak Quarantine, Isolation, and Lockdown Policies on Mental Health and Suicide," Front Psychiatry (April 16,2021) (recognizing that "as soon as these lockdown policies are implemented, there is no updated and functional suicide monitoring system data on the effect of COVID-19 lockdown and other social distancing measures on mental health and suicide.") (Publicly available at https://www.frontiersin.org/articles/10.3389/fpsyt.2021.565190/full).

21.)     Even if you were to ignore all the risk factors set clear above, **mask do not prevent the transmission of SARS-Co V-2.** First and foremost, according to OSHA only respirators can **"possibly"** protect against virus transmission in areas with community transmission of SARS-Co-V2 ands "[s]urgical masks are not respirators and do not provide the same level of protection to workers as properly-fitted respirators. cloth face coverings are also not acceptable substitutes for respirators. "See "Covid-19 Control and Prevention," united States Department of Labor, Occupational Safety and Health Administration (Publicly available at https://www.osha.gov/coronavirus/control-prevention).

22.)     NWCSD never mandated the use of respirators-nor should it have given the significant expense, necessary individual training, necessary medical exams, and the additional physical harm caused by long- term usage of such medical devices. In what can only be considered ironic, N95 respirators are not even intended to filter asbestos sized particles, aerosols, or to stop illness or disease-as

shown by reading the warnings on every respirator package. Indeed, every high-efficiency mask only provides "filtration efficiencies (60% and 46% For are 95 and KN 95 masks, respectively)" while "the more commonly used cloth (10%) and surgical masks (12%)**-effectively providing zero protection given the 10% and the 12% benchmarks also require perfect fit with no visible gaps.** See Shah, Y., er al., "Experimental investigation of indoor aerosol dispersion and accumulation in the context of Covid-1: Effects of masks and ventilation, "The Physics of Fluids (July 21, 2021) (Publicly available at

https://www.researchgate.net/publication/353484161).

23.)    Moreover if workers need respirators, they must be used in the context of comprehensive respiratory protection program that meets the requirements of OSHA's Respiratory Protection Standard (29 CFR 1910.134) And includes medical exams, fit testing and training" Understanding the Difference , "Centers for Disease Control and Prevention (Publicly Available at

https://www.cdc.gov/niosh/npptl/pdfs/understanddifferenceinfographic-508.pdf).also see _Gaps that are easily viewed on child in plaintiffs Gunter Co2 test conducted here:_

https://youtube.com/channel/UCoXkCUshCYG6SeahMBtRPwg).

24.)    Given that SARS-CoV-2 is 40,000 times smaller in area and 1000 times smaller in diameter than the cross-hyphen section of a human hair all one must do to demonstrate the fatal flaw in relying on 3-ply masks is testing whether a strand of hair can slip through any gap- something that can most certainly be done and seen in every instance of NWCSD mask wearing on students and staff. This was

recognized in a February 2021 study when it was determined "there may be an elevated risk of the airborne transmission of SARS-CoV-2 by way of the very small droplets that transmit through conventional masks and **traverse distances far exceeding the conventional social distance of 2m**." See Edwards, DA., et al., "Exhaled aerosols increase with COVID-19 infection, age, and obesity, "proceedings of the National Academy of sciences of the United States of America (February 23, 2021) (emphasis added) (Publicly available at https://www.pnas.org/content/118/8/e2021830118). The conventional face coverings used to satisfy NWSD's mask mandate do not Meet any of the several key OSHA Respiratory Protection standards for respirators and do not qualify as personal protective equipment because leakage occurs around the edges of all ordinary facial coverings and cannot provide a reliable level of protection against inhalation of very small airborne particles sufficient for adequate respiratory protection. The federal government's own regulations state as much. See 29 CFR 1910.134 here: https://www.osha.gov/laws-regs/regulations/standardnumber/1910/1910.134).

**25.)**     The CDC's transmission guidance-revised on May 7th 2021 states that "touching mucous membranes with soiled hands contaminated with virus" Is the third vector for SARS-CoV-2 transmission. See "scientific brief: SARS-CoV-2 transmission, summary of recent changes, "Center for Disease Control and prevention (May 7, 2021) (Publicly available at https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/sar-cov-2transmission.html).   Given that mask will never protect someone's eyes, there is

yet another reason why mask are inherently ineffective at stopping the spread of SARS-CoV-2 particles and why they are particularly harmful in school settings where children will continuously adjust masks and rub their eyes. Good personal hygiene-namely adequate and frequent hand washing will significantly assist where masks cannot.

**26.)**    While mask provides no real protection against aerosols transmitting SARS-CoV-2- the primary mode of viral transmission, engineering controls such as proper ventilation are indisputably effective at stopping the spread of the virus- something rarely mentioned by Oregon Heath Authority and CDC. As recently discovered by a group of researchers, "while higher ventilation capacities are required to fully mitigate aerosol build-up, even relatively low air-exchange rates (2h A1) Lead to lower aerosol build- up compared to the best performing masks in an UN ventilated space." See Shah, Y., et al., "Experimental investigation of indoor aerosol dispersion and accumulation in the context of Covid-19: Effects of masks and ventilation, "The Physics of Fluids (July 21, 2021) (Publicly available at https://www.researchgate.net/publication/353484161). Experimental investigation of indoor aerosol dispersion and accumulation in the context of Covid-19 Effects of masks and ventilation).

**27.)**    Rather than advocate the use of dangerous an ineffective masks NWCSD should ensure its schools have adequate Ventilation and filtration controls- most of which would not cost significant funds. Substantial mitigation of SARS- CoV-2 particles could be immediately achieved by: (i) Opening windows and using fans to draw outdoor air into indoor spaces (diluting the concentration of

aerosols), (ii) Setting fresh air dampers to maximum open on HVAC systems, (iii)n overriding HVAC energy controls, increasing the number of times indoor air is recycled, (iv) installing needlepoint ionization technology two HVAC intake fans, and (v) instilling inexpensive ultraviolet germicide devices into HVAC systems. See Employers guide to Covid-19 cleaning and disinfection in non-healthcare Workplaces," American Industrial Hygiene Association (August 11, 2020) (Publicly available at https://aiha-assests.sfo.digitaloceanspaces.com/AIHA/resources/Guidance-Documents/Employers-Guide-to-COVID-Cleaning-and-Disinfection-in-Non-Healthcare-Workplaces-Guidance-Document.pdf). See also Occupational Safety and Health Standards 29 CFR 1910.134 (a)(1) ("In the control of those occupational diseases caused by breathing air contaminated with harmful dusts, fog, fumes, mist, gases, smokes, sprays, or vapors, the primary objective shall be to prevent atmospheric contamination. **This shall be accomplished as far as feasible by accepted engineering control measures** (for example, enclosure or confinement of the operation, general and local ventilation, and substitution of less toxic materials). **When effective engineering controls are not feasible, or while they are being instituted, appropriate respirator shall be used pursuant to this section.")** (emphasis added).

**28.)**     If defendants truly cared about the health of students-which I can only assume they do, they would immediately end the end NWCSD mask mandate- a mandate that may have been born out of good intentions that can only be viewed as harmful and abusive today. Attending school for so many hours a day should

be a healthy and a non-abusive learning experience-not one which will jeopardize your health or mental safety to comply under coercion causes undue mental and emotional stress, as well as subjects you too future side effects some of which are known and some of which are unknown and lacking data. While children wearing a medical restraint that impedes breathing and drops oxygen levels and increasing $CO_2$ beyond the allowable OSHA amount for an 8-hour workday is most definitely endangerment of a minor and could not possibly even be fathomable as accepting the new status quo. if a student wants to wear a mask, that is up to a parent and a child, and they should be free to do so. Masks should never be forced on healthy persons who care about their health. in the same way those two viewed asbestoses as a "wonder material" years ago, in last the end NWCSD now adjust its course to 'follow the real science", it may similarly occupy the wrong place in history.

29.)    Furthermore, what NWCSD does by requiring the use of masks, collecting personal data of its students for purposes of enforcing quarantines, contract tracing, taking temperatures of students, etc. etc. Is a violation of the United States and Oregon constitutions.

30.)    The North Wasco County School District's COVID-19 resource, information page and dashboard tracks positive cases and quarantines across the district and are publicly available at https://www.nwasco.k12.or.us/Domain/520



31.)    Under the Federal CARES Act, ESSER Fund and other Federal

COVID-19 relief, NWCSD has received Federal funds as follows: ESSER

I -  $760,676.15  (publicly available

at https://www.oregon.gov/ode/schools-and-

districts/grants/Documents/CARES%20Act/ESSER/ESSER%20Fund%20

Grant%20Allocations%20for%20K-

12%20School%20Districts%20and%20ESDs%20by%20Category%206.2

3.20.pdf); AND ESSER II - $3,069,627.93 (publicly available

at https://www.oregon.gov/ode/schools-and-

districts/grants/Documents/CARES%20Act/ESSER%20II/ESSER%20II%

20Fund%20Grant%20Allocations%20for%20K-

12%20School%20Districts%20and%20ESDs%20by%20Category%203.2

3.21.pdf); AND ESSER III - $6,715,472.34 (publicly available

at https://www.oregon.gov/ode/schools-and-

districts/grants/Documents/CARES%20Act/ESSER%20III/ESSER%20III

%20Formula%20and%20Minimum%20Allocations%207.15.21.pdf);

AND Comprehensive Distance Learning (CDL) grant - $166,339.42

(publicly available at https://www.oregon.gov/ode/schools-and-

districts/grants/Documents/CARES%20Act/CDL/CDL%20Grant%20Prog

ram%20Allocations%20for%20K-

12%20School%20Districts%2010.29.20.pdf).

32.)    In August 2021, the Oregon Department of Education (ODE)

provided updated instructions to all Oregon public school districts as to

requirements that must be met (should they accept Federal ESSER funds)

in the form of instructions and a template that Oregon school districts

should utilize to document their COVID-19 operating plans for the 2021-

2022 school year. (publicly available instructions

at https://www.oregon.gov/ode/schools-and-

districts/grants/Documents/CARES%20Act/ESSER%20III/Safe%20Retur

n%20to%20In-

Person%20Instruction%20and%20Continuity%20of%20Services%20Plan

%20Instructions%207.21.21.pdf; and template available

at https://www.oregon.gov/ode/schools-and-

districts/grants/Documents/CARES%20Act/ESSER%20III/Safe%20Retur

n%20to%20In-

Person%20Instruction%20and%20Continuity%20of%20Services%20Plan

%20Template%207.21.21.pdf) (**Complaint Exhibit W** for NWCSD)

In total, NWCSD received $10,545,867.42 in Federal ESSER funds (related to COVID-19) with the understanding such funds will be used to comply with current (as well as any future) Federal standards, including those from the CDC. This was clearly spelled out in the Oregon Department of Education documents mentioned above as well as in the CDC's document titled ELC Reopening Schools: Support For Screening Testing To Reopen & Keep Schools Operating Safely. (publicly available at https://www.cdc.gov/ncezid/dpei/pdf/guidance-elc-reopening-schools-508.pdf) This information is also available in the American Rescue Plan Act of 2021 at https://www.congress.gov/117/plaws/publ2/PLAW-117publ2.pdf.  All states funding may be seen publicly here; https://oese.ed.gov/offices/education-stabilization-fund/elementary-secondary-school-emergency-relief-fund/esser-certifications-agreements/

33.)     NWCSD provides an illness and symptom chart, which outlines COVID-19 testing and quarantine procedures on their website at https://www.nwasco.k12.or.us/cms/lib/OR01001464/Centricity/Domain/520/10.19.21%20-%20UPDATED%20Do%20not%20send%20your%20student%20to%20school%20-%20chart.pdf

34.)     The NWCSD mask mandate tries to stop a virus with a near zero chance of significantly harming children. In fact, for those under 55 years old - which would include all students and most employees of NWCSD, the survival rate for COVID-19 is 99.6%. See Levin, A.T., et al., "Assessing the age specificity of infection fatality rates for COVID-19;

systematic review, meta-analysis, and public policy implications", Eur J
Epidemiology (December 8, 2020) ("The estimated age-specific [infection
fatality rate] is very low for children and younger adults (e.g., 0.002% at
age 10 and 0.01% at age 25) but increases progressively to 0.4% at age 55,
1.4% at age 65, 4.6% at age 75, and 15% at age 85.") (publicly available
at https://link.springer.com/content/pdf/10.1007/s10654-020-00698-1.pdf).

35.)    Under ORS 163.261 Definitions for ORS 163.264 (Subjecting another
person to involuntary servitude in the first degree), "Services" means activities
performed by one person under the supervision or for the benefit of another
person. [2007 c.811 §1].


**CONCLUSION**

The effectiveness of the mask to prevent disease transmission by children masked is not
currently known, what is known on the evidence before the court is that the mandate will have
crippling effect on significant issues of rising daily danger and irreparable harm now and in the
future if not remedied.

Defendants cite some assumed legal authority to support the mask mandates, but to the
extent any authority is provided, the authority is not unlimited or lawful in fact.

Plaintiffs cited relief asking for a temporary restraining order and preliminary injunction
from the court. Plaintiffs specifically asked for an TRO and preliminary injunction in which is
staking a claim on their health by stopping the negligent infliction of distress to plaintiffs and
their children as a result of masking and usurpation. Plaintiffs do not believe that you can put a
monetary price in dollars on such an action and one's health based on man's inflicted "status
quo" of dollar amounts when filing a lawsuit that is priceless!

PAGE 43 - PLAINTIFFS' BRIEF IN SUPPORT OF TEMPORARY RESTRAINING ORDER AND PRELIMINARY
INJUNCTION

## PRAYER FOR RELIEF

WHEREFORE, Petitioners pray for this Honorable Court to enter a temporary restraining order enjoining Respondents, and their agents, from requiring any masks, face coverings or devices as they restrict and impede children's breathing which is a form of child abuse until Petitioners' Petition for Preliminary Injunction can be heard by this Court.  The masking requirement by the NWCSD for all K-12 Schools was adopted after the August 19, 2021 School Board Meeting as contained in the Safe Return to In-Person Instruction and Continuity of Services Plan.

Respectfully submitted this 10th Day of December, 2021.

/s/ Jennifer Rae Gunter
1601 G St.
The Dalles, OR 97058
(Telephone) 541-993-5366

/s/ Robert Jay Schwartz ND LAC
3135 Mill Creek Road
The Dalles, OR 97058
(Telephone) 541-296-8988

/s/ Holly Lynn Gove
421 W. 15th St
The Dalles, OR 97058
(Telephone) 541-993-4707

/s/ Chelsea Elizabeth Perritt
219 W. 14th Street
The Dalles, OR 97058
(Telephone) 503-437-8370

# STATE OF FLORIDA

## OFFICE OF THE GOVERNOR
## EXECUTIVE ORDER NUMBER 21-175
### (Ensuring Parents' Freedom to Choose – Masks in Schools)

**WHEREAS**, a right to normal education is imperative to the growth and development of our children and adolescents; and

**WHEREAS**, last summer, at my direction, Florida's Department of Education ordered schools to be open for in-person instruction for five days per week to ensure the continued well-being of students and families; and

**WHEREAS**, schools – including those that did not require students to be masked – did not drive community transmission of COVID-19; and

**WHEREAS**, despite recent Centers for Disease Control and Prevention (CDC) "guidance," forcing students to wear masks lacks a well-grounded scientific justification; indeed, a Brown University study analyzed COVID-19 data for schools in Florida and found no correlation with mask mandates; and

**WHEREAS**, masking children may lead to negative health and societal ramifications; and

**WHEREAS**, studies have shown that children are at a low risk of contracting a serious illness due to COVID-19 and do not play a significant role in the spread of the virus; and

**WHEREAS**, forcing children to wear masks could inhibit breathing, lead to the collection of dangerous impurities including bacteria, parasites, fungi, and other contaminants, and adversely affect communications in the classroom and student performance; and

Exhibit 1

**WHEREAS**, there is no statistically-significant evidence to suggest that counties with mask requirements have fared any better than those without mask requirements during the 2020-2021 school year; and

**WHEREAS**, on April 29, 2021, Florida Surgeon General Dr. Scott Rivkees issued a Public Health Advisory stating that continuing COVID-19 restrictions on individuals, including long-term use of face coverings, pose a risk of adverse and unintended consequences; and

**WHEREAS**, on June 29, 2021, I signed into law H.B. 241, the Parents' Bill of Rights, which prevents the state, its subdivisions, or any governmental institution, from infringing on the fundamental rights of a parent to direct the upbringing, education, health care, or mental health of a minor child without demonstrating that such action is reasonable and necessary to achieve a compelling state interest and that such action is narrowly tailored and is not otherwise served by less restrictive means; and

**WHEREAS**, pursuant to Florida law, all parents have the right to make health care decisions for their minor children; and

**WHEREAS**, many school districts are scheduled to begin classes on August 10, 2021, which is less than two weeks away, and within four weeks virtually all public schools across Florida will be underway; therefore immediate action is needed to protect the fundamental right of parents to make health and educational decisions for their children; and

**WHEREAS**, Section 1003.22(3), Florida Statutes, mandates the Florida Department of Health to adopt rules, in consultation with the Florida Department of Education, governing the control of preventable communicable diseases, including procedures for exempting children from immunization requirements; and

**WHEREAS**, Florida's State Board of Education, the chief implementing and coordinating body of public education in Florida, has the authority to adopt rules pursuant to Sections

120.536(1), 120.54, and 1001.02, Florida Statutes, and may delegate its general powers to the Commissioner of Education; and

**WHEREAS**, pursuant to Section 1008.32(4), Florida Statutes, if the State Board of Education determines that a district school board is unwilling or unable to comply with the law, the State Board shall have the authority to, among other things, withhold the transfer of state funds, discretionary grant funds, discretionary lottery funds, or any other funds specified as eligible for this purpose by the Legislature until the school district complies with the law or state board rule and declare the school district ineligible for competitive grants; and

**WHEREAS**, given the historical data on COVID-19 and the ongoing debate over whether masks are more harmful than beneficial to children and to school environments in general, we should protect the freedoms and statutory rights of students and parents by resting with the parents the decision whether their children should wear masks in school; and

**WHEREAS**, we should equally and uniformly protect the freedoms and rights of students and parents across the state.

**NOW, THEREFORE, I, RON DESANTIS**, as Governor of Florida, by virtue of the authority vested in me by Article IV, Section 1(a) of the Florida Constitution, and all other applicable laws, promulgate the following Executive Order, to take immediate effect:

Section 1.   I hereby direct the Florida Department of Health and the Florida Department of Education, working together, to immediately execute rules pursuant to section 120.54, Florida Statutes, and take any additional agency action necessary, using all legal means available, to ensure safety protocols for controlling the spread of COVID-19 in schools that:

A.  Do not violate Floridians' constitutional freedoms;

B.  Do not violate parents' right under Florida law to make health care decisions for their minor children; and

3

C. Protect children with disabilities or health conditions who would be harmed by certain protocols such as face masking requirements.

Section 2. Any action taken pursuant to Section 1 above shall at minimum be in accordance with Florida's "Parents' Bill of Rights" and protect parents' right to make decisions regarding masking of their children in relation to COVID-19.

Section 3. The Florida Commissioner of Education shall pursue all legal means available to ensure school districts adhere to Florida law, including but not limited to withholding state funds from noncompliant school boards violating any rules or agency action taken pursuant to Section 1 above.

Section 4. This does not prohibit the Florida Legislature from exploring legislation to further protect the fundamental rights of students and parents to be free from excessive, harmful regulation in schools.

Section 5. This Executive Order is effective immediately.



IN TESTIMONY WHEREOF, I have hereunto set my hand and caused the Great Seal of the State of Florida to be affixed, at Tallahassee, this 30th day of July, 2021

_____
RON DESANTIS, GOVERNOR

ATTEST:

_____
SECRETARY OF STATE

2021 JUL 30 PM 3:45
DEPARTMENT OF STATE
TALLAHASSEE, FL
FILED

4



*Cover graphic courtesy of Centers for Disease Control and Prevention (CDC)*

White Paper on

# Ventilation for Industrial Settings during the COVID-19 Pandemic

by

## American Conference of Governmental Industrial Hygienists (ACGIH®)

### Industrial Ventilation Committee

### August 2020

Exhibit 2

## Preamble

This White Paper, developed by the Industrial Ventilation Committee of the American Conference of Governmental Industrial Hygienists (ACGIH®), originates from concern about the proper use of ventilation controls in industrial workplaces where SARS-CoV-2 (the Coronavirus responsible for COVID-19) is potentially present. This volunteer committee, with expertise in industrial ventilation, offers guidance on the topic of industrial ventilation to industrial/commercial facilities that are planning operational controls to reduce the impact of the COVID-19 pandemic for employees returning to work around the world. These *recommended practices* are intended as guidance for Occupational and Environmental Health and Safety professionals and others including plant managers as they seek to mitigate exposures for their workforce during the COVID-19 pandemic.

Included within this paper are COVID-19 exposure control strategies that consider all of the traditional industrial hygiene Hierarchy of Controls. It will provide some practical suggestions about the use of ventilation principles and concepts that can help reduce worker exposure to droplets and aerosols that may contain Coronavirus-19. It will also communicate some simple guidelines and principles that can be used to select and design ventilation controls to limit the spread of Coronavirus disease. This White Paper will NOT opine on heating, ventilation and air-conditioning (HVAC) systems and other ventilation systems that are used in office situations, as they have been addressed by ASHRAE in recent documents (ASHRAE, 2020).

The design of an overall exposure control strategy in a facility within the context of Coronavirus-19 will likely require a combination of control strategies. Currently available information characterizes this biological hazard as:

➢ potentially severe in its effects,
➢ highly contagious,
➢ associated with a significant percentage of infectious, although asymptomatic, individuals,
➢ transmitted person-to-person,
➢ initiating respiratory infection through inhalation and contact with the eyes, nose, and mouth, and
➢ having an unknown infectious dose range at the time of this writing.

Therefore, these guidelines address possible courses of action regarding the use of industrial ventilation systems for local exhaust, dilution, and convective cooling purposes within the context of prevention of transmission of Coronavirus-19. The type of industry, worker occupation, exposure profile, climate, facility layout, and indoor environmental conditions will affect how these guidelines should be implemented.

2

## Introduction and Background

Coronavirus Disease 2019 (COVID-19) is associated with a pathogenic novel coronavirus (SARS-CoV-2 or Coronavirus-19 for the purpose of this document) from the same family of viruses responsible for the Severe Acute Respiratory Syndrome (SARS) outbreak experienced between 2002 and 2004. COVID-19 is caused by a single-stranded RNA virus with a lipid envelope that has a diameter of approximately 120 nm (wetted particle size larger) (Zhu, 2020; CDC, 2020).

Symptoms associated with COVID-19 vary by age and health status from mild flu-like symptoms to severe respiratory distress and death. According to the Centers for Disease Control and Prevention (CDC), individuals with increased susceptibility to more severe COVID-19 illness include those over 60 years of age and those with underlying health issues, such as serious cardiovascular conditions, moderate to severe lung disease or asthma, immune system deficiencies, obesity, and underlying medical conditions (such as diabetes, or renal or liver disease) (CDCa, 2020). In addition, a proportion (5%–80%) of infected individuals may not show symptoms (asymptomatic) (Oxford University, 2020; Oran and Topol, 2020).

Disease transmission has been demonstrated to occur person-to-person and is thought to occur through:

➢ propulsion of large droplets generated from coughing and sneezing directly into the face, nose, eyes, and mouth of someone nearby (droplet transmission),
➢ inhalation of infectious particles generated by breathing, talking, singing, coughing, and sneezing that remain suspended for lengthy periods or are distributed by indoor air currents (aerosol transmission) (Jones, 2015), and
➢ contaminated hand-to-mucus membrane contact (contact transmission) (CDCb, 2020).

Airborne transmission (inhalation of infectious particles at a long distance from the source, e.g., through a ventilation system) cannot be ruled out given the potential extended viability of Coronavirus-19 in air (van Doremalen et al., 2020) as shown in laboratory experiments (CDCd, 2019).

Currently, there is uncertainty as to how many virions (viruses) are required to achieve an infectious dose (i.e., how much virus is necessary to infect someone) and about the nature of droplet, aerosol and airborne transmissions including relevant particle sizes, particle behavior over time, and the amount of viable virus present in a given aerosol particle. Since aerosols are a potentially important route of exposure, their control must be considered in a larger, overarching strategy for minimizing Coronavirus-19 transmission in industrial settings. Ventilation, as a type of engineering control, can play an important role in controlling exposure to an infectious aerosol in an indoor industrial workplace.

## Hierarchy of Controls

As part of the normal hazard assessment, experts such as Certified Industrial Hygienists (CIHs) should inspect and evaluate each area of the workplace through the Hierarchy of Controls lens to determine how best to protect workers. This assessment involves noting all processes and conditions that have the potential to harm employees through chemical/dust

3

exposures, hazardous energy, dangerous machinery, etc. During the current pandemic, it is necessary to look for instances that may increase the risk of worker exposure to the virus.

This worker exposure will primarily be through prolonged close proximity to other workers who are infected, but exposure could also include the use of shared tools, inadequate or poorly directed ventilation, and close contact associated with an excessive number of employees in common areas (such as cafeterias) at one time.

As shown in Figure 1, the methods of controlling a hazard generally become less effective moving down the hierarchy. **Elimination** requires source removal, which could involve removing infected individuals from the workplace through screening or testing, assigning remote work (where possible) or limiting the number of individuals in a space at one time (and enforcing social distancing) to lower airborne concentration. **Substitution**, replacing the source with something less hazardous, may not be relevant although automation (e.g., robots) may be useful in some instances. **Engineering controls, administrative controls and personal protective equipment (PPE)** all have a place in protecting workers during the pandemic. While engineering controls are generally most protective for workers, due to the nature of the virus and the limitations of most industrial ventilation systems, administrative controls or some form of personal protection may also be essential in combination with engineering controls, such as ventilation.



**FIGURE 1. Hierarchy of Controls (NIOSH, 2020)**

4

## Engineering Controls

### *Basic Principles for COVID-19 Ventilation in an Industrial Setting*

Ventilation, if designed and implemented properly plays a critical role in mitigating disease by reducing droplets and aerosols in air, and subsequent airborne transmission. The two types of ventilation that can impact concentration include general exhaust ventilation (GEV) in the form of dilution ventilation, and local exhaust ventilation (LEV). Dilution ventilation occurs when contaminants of concern within a space are reduced by removing contaminated air and replacing it with clean air. This may be accomplished either by 1) replacing room air parcels with clean ones (plug or laminar flow, 50–150 feet per minute) (see Figures 2 and 3), or 2) diluting existing contaminated air with cleaned, outside air using mixing (see Figure 4). Alternatively, LEV occurs when contaminants generated within a space are captured using exhaust capture devices (e.g., hoods) at or close to the source.

In order to fully understand how a ventilation system is working, an audit should be conducted to determine where and how air enters and exits from the space. Then a general idea about the overall airflow pattern can be estimated. For any air that is being recirculated, such as from LEV or from office spaces, the ability to remove as much of the virus load as possible before reintroducing the air is critical. (See section titled Filtration in this document and ASHRAE 2020 document.)

## 1.  General Exhaust Ventilation

For typical industrial applications, the intent of dilution ventilation is to either replace parcels of contaminated air or dilute those parcels with clean, outside air (or filtered recirculated air) to reduce the contaminant level below some recommended level to avoid worker overexposures and adverse health effects. In the case of Coronavirus-19, where each worker is a potential contaminant source, the airflow pattern is the most critical issue to determine, modify, and control.

Dilution ventilation consists of exhaust fans that pull air through exhaust openings in the workspace and the makeup air and supply fans that replace the air that was removed. The makeup air may come from supply fans or openings in the building envelope such as windows, doors, or vents.

If open doors, windows, or vents are currently the only source of available replacement air, consideration should be given to installation of a ducted, powered air system, with airflow introduced at or near the floor level so the replacement air can move past a worker and up to the exhaust without passing other workers (combined with social distancing practice). If there is an existing supply air system, consider modifying the system to duct and deliver the air at or near floor level. Figure 2 illustrates an example of an appropriate supply/exhaust airflow arrangement.



**FIGURE 2. Displacement Ventilation**

Vertically directed dilution ventilation, taking advantage of thermal displacement (warmer air at the breathing zone rising up toward the exhaust source) should effectively reduce risk of worker exposure to potentially infectious aerosols exhaled or generated by other workers. To understand thermal rise for a human being, consider the fact that the air expelled from human lungs is significantly lighter and more buoyant than most air because of its inherent relative humidity and human body warmth (see Figure 3). In general, replacing air at low velocities is preferable to mixing air with high velocities when a high toxicity contaminant is present. In certain applications, turbulent mixing may increase the potential for employee exposure.



**FIGURE 3. Thermal Plume in Displacement Ventilation (Courtesy of Price Industries)**

## 2. Local Exhaust Ventilation

LEV utilizes dedicated exhaust fans and ducts to capture contaminants at their source, keeping them from creating potential exposures. See Chapters 5, 6, and 7 in *Industrial Ventilation: A Manual of Recommended Practice for Design,* 30th Edition (the "Design Manual") (American Conference of Governmental Industrial Hygienists, 2019). Examples of LEV in industrial settings include fixed or portable snorkels for capturing welding fumes or downdraft tables for capturing grinding particles in metal working applications. See VS-80-01 and VS-90-02 in the Design Manual (American Conference of Governmental Industrial Hygienists, 2019). LEV offers the advantage of much lower airflows and lower volume of make-up air. The major disadvantage of LEV is that the capture point is fixed and not always located at the point of contaminant generation (in the case of Coronavirus-19, the worker's face). To protect the worker from workplace contaminants, the worker should be located upstream of the contaminant when possible, not positioned downstream of another potentially infectious worker.

## 3. Fans

Large ceiling fans will cause downflow of air around workers and potentially return buoyant viral particles back towards worker breathing zones. Taking the large ceiling fans offline during a pandemic should be considered. Ideally, air replacement at or near the floor in the building with roof exhaust is preferred to promote displacement ventilation and establish the optimal direction of airflow. However, where displacement ventilation cannot be established, mixing air using ceiling fans with dilution ventilation may be the only practical alternative (Figure 4).

Personal cooling fans are another source of air movement. Without the benefit of perspiration/evaporative cooling, many industrial workers could suffer harm from heat-stress related illnesses. Therefore, personal cooling fans should **NOT** be removed in industrial settings without regard for worker health. By ensuring that the air source moved by the cooling

7

fan is originating from a cleaner area and not near another worker, these fans can provide safe cooling airflow. It is important to make sure that a fan does not blow air from one worker to another. The preferred airflow arrangement is vertical displacement with supply coming in above the floor baseboard level and being exhausted at or near the ceiling.

A study from a recent COVID-19 outbreak in a restaurant (Jianyun Lu, 2020) indicates that a high-velocity HVAC air current induced a countercurrent flow vector that appears to have effectively spread the virus to a number of other patrons who were in or very near the airflow pattern but still proximate to the primary infectious individual. Ventilation practitioners should keep in mind the potential for eddy currents and other airflow disturbances to avoid virus transmission.

## 4. Filtration

Filtration at the appropriate level may be capable of conditioning air to a contaminant level that is equal to or reasonably as clean as outside or "fresh" air. Replacing air is important, measured as air changes per hour (ACH) or the total air delivered to a space per hour divided by the volume of the space. Both mixing ventilation (turbulent flow) and displacement ventilation (streamline or plug flow) have application in dilution ventilation schemes as the application demands. See Figure 4 for both of these concepts. [The white box shown in the corner is a low-velocity non-turbulent supply diffuser.]

$$ACH = CADR\ (ACFM) \times 60\ (min/hr)/room\ volume\ (cu\ ft)$$

$$CADR = airflow\ rate\ (ACFM) \times removal\ efficiency$$



**FIGURE 4. Mixing vs. Displacement Ventilation**

Filtration of 99+% of particles requires high efficiency particulate air (filtration, HEPA) (ASHRAE MERV 17; MERV—Minimum Efficiency Reporting Value) or greater efficiencies, and existing make-up air and recirculating systems are not typically capable of handling true HEPA filtration due to the high pressure drop and size constraints of this type of filter. However, a recent ASHRAE study shows that *electret (electrostatic charged)* MERV 13 or 14 filters are capable of high filtration efficiencies on viral particles (89%–97%) with filter sizes similar to existing MERV 5–8 "throwaway" filters commonly used in HVAC applications (Zhang et al., 2020). Figure 5 shows the efficiencies of various MERV rated filters. The blue shaded areas indicate the size of particles created by humans while breathing normally (light blue), and with other respiratory activities (dark blue) (Parienta et al., 2011).



**FIGURE 5. Filtration Efficiency at Different Particle Sizes for Different MERV Efficiencies (Figure adapted from ACGIH® 2019)**

In addition, it should be known that air filtered through conventional fabric filter (baghouses, etc.) and electrostatic precipitators are capable of similar efficiencies and specifically that a "seasoned" fabric filter typically exhibits a similar efficiency to HEPA filtration. These dust collector style filters will also reduce the risk of Coronavirus-19 distribution and transmission as long as the air is reintroduced to the plant in a non-turbulent fashion and in a manner that establishes the preferred airflow direction (see Chapter 8 of the Design Manual)

Portable HEPA filtration units could be useful if placed in close proximity to workers who remain in place during their working day. These units have a limited area of influence and many units do not meet their stated efficiency, particularly the electrostatic units. These portable units should be considered carefully before purchase and use. Existing portable HEPA filtration should not be turned off, but one should consider the potential for exposure of

9

downstream individuals if an infected worker is located between the unit and other individuals in the same room.

Employers should investigate the use of improved filtering systems that may be available and either compatible or potentially fitted to their existing air handling systems. Good examples of this are 'electret' filters and electrostatic precipitators (ESPs). Both of these filtration technologies are robust, have been used effectively for many years, and remove fine and ultrafine particles with predictable success. Placed in series within an air handling system, they could be effective in the capture and reduction of Coronavirus-19 in air. Seek professional design help before modifying any air handling system.

Paint-spray and other large exhaust booths are useful in reducing Coronavirus-19 exposure risks because they require the facility ventilation system to supply large amounts of outdoor (replacement) air. In addition, workers stationed in the booth have a low risk of Coronavirus-19 exposure due to the high air volume turnover rates.

Local exhaust hoods are typically not effective in capturing particles at more than one hood diameter away from the hood inlet. At three times the hood diameter, aerosols are significantly more influenced by room currents than by the LEV (see Chapter 6, Hood Design, of the Design Manual). This does **NOT** mean that LEV systems should be turned off during a viral pandemic. In fact, they are an important source of reducing local airborne virus concentrations. LEV systems evacuate air from the space creating a negative pressure gradient therefore encouraging air at higher pressure (outside the building) to infiltrate in an attempt to balance the pressure difference between inside and outside. Permit LEV systems to operate continuously while workers are present. In a general sense, LEV systems are designed to replace exhausted air with makeup air unless it is a recirculated system. As usual, maintain makeup air systems to reduce air sweeping into the workspace through open doorways and windows.

All established LEV systems should continue to be used for existing workplace hazards. The presence of a new hazard – infectious aerosols – does not negate or change the ongoing need for continued protection of workers from all other hazards. As with any new hazard, assessment of exposures and selection of controls must be done in the context of all hazards. Allow the GEV and LEV systems to operate continuously or long enough to allow for several complete air changes following the departure of all building occupants. If the system is shut down or set back overnight (i.e., between work shifts), return to full operating conditions prior to occupant return. Permit LEV systems to operate continuously. If variable air volume laboratory hoods are present, leave the hood sash in the up position to allow for maximum airflow and maximum air volume to be exhausted when not in use by workers.

If an industrial site has an HVAC system for the purposes of general dilution and comfort control, it may be appropriate to:

➢ Increase the amount of outdoor air supplied by the system to the maximum capacity permitted by the system. Additional considerations include climate and local air quality (e.g., humidity).
➢ If air is recirculated, a MERV 13 or better filter is recommended to improve the capture of infectious aerosols.

➢ Consult with a ventilation system engineer to ensure that the system is operating correctly, is well-maintained and can accommodate the added pressure drop caused by a MERV 13 or better filter.

➢ Depending on the actual air exchange rate and number of occupants, it may be appropriate to operate the HVAC system for an extended period of time after all occupants have departed, to ensure adequate clearance of infectious particles.

In restrooms, the following practices are recommended:

➢ Restroom fans should be operated continuously and should exhaust directly outdoors.

➢ To minimize aerosolization of infectious particles not removed by handwashing, disposable paper towels should be used for hand drying, rather than air dryers.

## 3. Room/Building Pressurization

An additional ventilation control technique is room pressurization. By adjusting the volumes of air entering and leaving a particular space, that space can be balanced to become positively, negatively, or neutrally pressurized. Slightly positively pressurized spaces tend to keep air from coming in from outside to control contaminants from the adjoining space. Negatively pressurized spaces tend to limit the escape of contaminants generated within the space such as with airborne infection isolation rooms and autopsy rooms. These required conditions may have application to the ventilation schemes addressed above and should be considered. It is recommended that the ventilation professional at industrial facilities consider positive or negative room pressurization to potentially control the spread of COVID-19 in their facilities.

Additionally, an entire facility or large workspace can be positively pressurized, thereby eliminating indraft currents that may cause unpredicted airflow from one employee towards another. Bringing a facility under positive pressure (vs. atmospheric pressure) causes the area to have a mixing factor ($m_i$ or K factor) of 1. This technique is discussed in Chapter 11, Supply Air Systems, of the Design Manual. Consult local codes for compliance.

## 4. Ultraviolet Germicidal Irradiation

Ultraviolet germicidal irradiation (UVGI) has been used for supplemental engineering control (ventilation being the primary control technique) of airborne microbial contamination in indoor spaces. It has been most commonly used in homeless shelters and hospitals. UVGI systems have been applied for disinfection and inactivation of fungal and bacterial microorganisms for sixty (60) years or more; they have been examined in remote applications including in ducts, inside filter banks, and also in point-of-use and upper room (ceiling return) applications. UVGI has been determined to provide a viable, supplemental control technology for Coronavirus-19 applications. However, a thorough treatment of this topic is beyond the scope of this paper; additional information can be found in ASHRAE, 2019. Note: The use of UVGI at typical wavelengths (i.e., ~254 nm, UVC) requires protection from the light emitted from the UV source for employees, maintenance personnel, and other room occupants, as UV exposure is harmful to human skin and eyes at relatively low source power.

Before World War II, much research was conducted on the germ-destroying ability of UV light, which later diminished with the advent of antibiotics. Recently, however, due to the pandemic a resurgence of interest in the use of UVGI has brought this technology back as a valid viral inactivation treatment for large amounts of air that may be readily applied to the manufacturing workplace. One must do the research to determine whether the UVGI vendor truly understands the application and requirements for effective virus inactivation. UVGI effectiveness requires addressing the ability of the system design to meet the specific conditions while considering the light wavelength, the contact time and the distance from the source (intensity), which are the primary criteria for effective disinfection by UVGI.

## Administrative Controls

Administrative controls are ways of changing how employees conduct their job that will tend to limit their risk of exposure to hazards. Some administrative controls may reduce the potential for worker exposure to infectious aerosols. A number of these are mentioned below.

➢ Inform all employees about the hazards and symptoms of COVID-19. Tell them to stay home or to leave work if they feel sick.

➢ Provide a station to screen employees entering the building using a standard questionnaire and non-contact temperature measurement device.

➢ Provide training for all employees about rules for social distancing, sanitation, handwashing, and sick leave policies. Have a plan to separate sick employees if someone fails the health check or becomes ill during the workday.

➢ Develop enhanced cleaning and sanitation plans for the entire facility. Use EPA-registered disinfectants that are effective against Coronavirus-19. A link to this list may be found here (EPA, 2020).

➢ Remind employees to stay six (6) feet apart with signage and by placing marks on the floor or using stanchions. Workers should be reminded about maintaining social distancing during breaks, in restrooms, and when entering and leaving the facility.

➢ Supply additional handwashing stations to facilitate regular handwashing. No touch hand sanitizer dispensers should also be supplied for times when workers cannot wash their hands with soap and water.

➢ Remind employees to cover their coughs and sneezes with their elbow or a tissue. Dispose of the tissue and wash hands afterward. This can be accomplished with signage.

➢ Arrange workstations to allow for adequate physical distancing – at least six (6) feet – between workers. This may require rerouting aisles to keep workers from passing too close to one another. One-way (i.e., unidirectional) aisles are another way to avoid workers coming into close contact with one another (Figure 6).

➢ Supply paper towels, tissues, and no touch waste receptacles.

12



**FIGURE 6. How to Align Manufacturing Workers (CDCc, 2020)**

## Personal Protective Equipment

PPE, particularly respiratory protective equipment (RPE), is usually the least favorable choice in the Hierarchy of Controls strategy. However, due to the uncertainties associated with COVID-19 transmission and the unknown infectious dose, most localities are requiring that individuals wear cloth face coverings or a form of respiratory protection. A cloth face covering helps protect others from respiratory droplets, but it does NOT protect the person wearing it or others from smaller particles. If everyone in the workplace wears a cloth face covering, it is expected that the risk of exposure to Coronavirus-19 will be decreased by limiting droplet exposure. It is important to recognize that only NIOSH-certified respirators are true RPE that provide reliable protection for the wearer. Surgical and similar procedural masks (including cloth face coverings) are primarily for protecting others from contaminants exhaled or generated by the wearer. To protect the wearer from Coronavirus-19 exposure, current guidelines indicate that a NIOSH-certified N95 filtering facepiece respirator affords the minimum recommended protection. Such a respirator must be properly fitted and used on a clean shaven face. In locations such as meat packing facilities, where employees actively work within 6 feet of each other, engineering controls (such as ventilation and barriers, see Figure 6) alone should NOT be relied upon to provide the protection needed for continued worker health. PPE such as respirators may be required for control of potential exposure to Coronavirus-19 during this type of work.

CDC recommends wearing cloth face coverings as a protective measure in addition to social distancing (i.e., staying at least 6 feet away from others). Cloth face coverings may be especially important when social distancing is not possible or feasible based on working conditions. Cloth face coverings are not PPE or RPE. They are not appropriate substitutes for PPE such as respirators (like N95 respirators) or medical facemasks (like surgical masks) in workplaces where respirators or facemasks are recommended or required to protect the wearer (OSHA, 2011).

A cloth face covering may reduce the amount of large respiratory droplets that a person spreads when talking, sneezing, or coughing. Cloth face coverings may prevent people who do not know they have been infected with the Coronavirus-19 virus from spreading it to others. Cloth face coverings are intended to protect other people—not the wearer (CDCc, 2020). Employers who determine that cloth face coverings should be worn in the workplace, including to comply with state or local requirements for their use, should ensure the cloth face coverings are worn appropriately (CDCe, 2020)

## Important Suggested Measures

➤ Increase the outdoor air supply to 100%, if possible, or to the maximum allowed by the capabilities of the ventilation system. Some additional considerations include the climate, air pollution, and system capacity, and making sure the outdoor air intakes are clear and not drawing air from a parking lot, traffic side of building, or near smoking areas or loading docks. Make sure the ventilation system is performing as designed and has been properly maintained per ASHRAE 62.1.

➤ Maintain between 6 and 12 ACH, which will provide greater than 99% purge in 30–60 minutes (CDCd, 2019).

➤ Increase the filtration efficiency of the system to MERV 13 or as high as the filter racks and fan pressure drop will allow. System designers should attempt to accommodate Tier 1 MERV filters (MERV 13 and 14) in their current and future designs, as applicable, to ensure best airflow through the system with equipment that can withstand the added pressure drop.

➤ Provide additional dilution ventilation to disperse small airborne particles. Dilution ventilation should be introduced into the facility at low velocities at floor level whenever possible, with directed flow toward exhaust fans above, and spread over large areas.

➤ Allow the ventilation system to operate continuously if the building is occupied or long enough to allow for several complete air changes following the departure of all building occupants. If the system is shut down or set back overnight, return to full operating conditions prior to occupant return.

➤ Make sure restroom fans operate continuously and are exhausted directly outdoors with exhausts away from facility ventilation supply intakes. Temporarily disable or discontinue use of hand dryers in restrooms and replace with disposable paper towels.

➤ Allow LEV systems to operate continuously while attended. If variable air volume laboratory hoods are present, leave the hood sash in the up position to allow maximum airflow and maximum air volume to be exhausted when not in use.

➤ General airflow direction should be from cleaner air to less clean air, and processes and workers should be placed on the cleaner side of the airflow pattern within this general airflow pattern to reduce their exposures. Avoid having personal or pedestal fans blow from one person to another. Remember they will blow 30–40 times the fan diameter very effectively.

➤ Typically, more outdoor air is better. However, high velocity currents passing through open doorways or from a pedestal fan can project viruses hundreds of feet in rapid fashion (although some dilution will also occur). Where inflow occurs at high velocity near workers, attempt to diffuse large air currents by directing or blocking the flow stream to avoid moving the air from person to person. Expanded metal and perforated or unperforated screens are very effective to diffuse large air masses at high velocity.

**Useful Resources for COVID-19 Related Information**

CDC (Centers for Disease Control and Prevention). Coronavirus (COVID-19) (cdc.gov/coronavirus/2019-nCoV)

Businesses and Workplaces (https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/businesses-employers.html)

Cleaning and Disinfecting (https://www.cdc.gov/coronavirus/2019-ncov/community/clean-disinfect/index.html)

Guidance for Reopening Buildings after Prolonged Shutdown or Reduced Operation (https://www.cdc.gov/coronavirus/2019-ncov/php/building-water-system.html)

Worker Safety and Support (https://www.cdc.gov/coronavirus/2019-ncov/community/worker-safety-support/index.html)

OSHA (Occupational Safety and Health Administration). COVID-19. (osha.gov/SLTC/covid-19)

National Safety Council. Guidance for Employers: COVID-19 and the Workplace. (https://www.nsc.org/work-safety/safety-topics/coronavirus)

EPA (Environmental Protection Agency). Coronavirus (COVID-19). (epa.gov/coronavirus)

AIHA (American Industrial Hygiene Association). Coronavirus Outbreak Resource Center. (aiha.org/public-resources/consumer-resources/coronavirus_outbreak_resources)

National Association of Manufacturers. Covid-19 Resources (nam.org/coronavirus)

ACGIH. Industrial Ventilation: A Manual of Recommended Practice for Design, 30th Edition

ACGIH. Bioaerosols: Assessment and Control

# References

American Conference of Governmental Industrial Hygienists. (2019). *Industrial Ventilation: A Manual of Recommended Practice for Design.* Cincinnati: ACGIH.

ANSI/ASHRAE. (2019). Standard 62.1-2019. *Ventilation for Acceptable Indoor Air Quality.*

ASHRAE. (2019). Chapter 62 Ultraviolet Air and Surface Treatment. In *ASHRAE Handbook: HVAC Applications* (pp. 62.1-62.17).

ASHRAE. (2020). *ASHRAE Position Document on Infectious Aerosols.* Atlanta, GA: ASHRAE.

CDCa. (2020, July 20). *Coronavirus (COVID-19).* Retrieved from Centers for Disease Control and Prevention: https://www.cdc.gov/coronavirus/2019-nCoV/index.html

CDCb. (2020, June 16). *Coronavirus Disease 2019 (COVID-19)/How COVID-19 Spreads.* Retrieved July 10, 2020

CDCc. (2020, July 9). *Meat and Poultry Processing Workers and Employers.* Retrieved from Coronavirus Disease 2019 (COVID-19): https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/meat- poultry-processing-workers-employers.html

CDCd. (2019). *Environmental Infection Control Guidelines. Appendix B. Air.* Retrieved from CDC: https://www.cdc.gov/infectioncontrol/guidelines/environmental/appendix/air.html

CDCe. (2020, August 7). *Coronavirus Disease 2019 (COVID-19)/How to Wear Masks.* Retrieved from How to Wear Masks: https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-to-wear-cloth-face- coverings.html

EPA, U. (2020, July 9). *List N: Disinfectants for Use Against Coronavirus-19.* Retrieved July 11, 2020

Jianyun Lu, J. G. (2020). COVID-19 Outbreak Associated with Air Conditioning in Restaurant in Guangzhou, China, 2020. *Emerging Infectious Diseases.*

Jones, R. M. (2015). Aerosol transmission of infectious disease. *Journal of Occupational and Environmental Medicine*, 501-508.

NIOSH. (2015, January 13). *Hierarchy of Controls.* Retrieved July 10, 2020

Oran, Daniel P., Topol, Eric J. Prevalence of Asymptomatic SARS-CoV-2 Infection: A Narrative Review. Annals of internal medicine 3 Jun 2020. https://doi.org/10.7326/M20-3012.

OSHA. (2011). *Respiratory Protection (29 CFR 1910.134(c)).* Retrieved July 10, 2020,

from OSHA. Oxford University. (2020, May 20). *What proportion are asymptomatic.*

Retrieved from COVID-19: https://www.cebm.net/covid-19-what-proportion-are-asymptomatic

Parienta, D., Morawska, L., Johnson, G.R., Ristovski, Z.D., Hargreaves, M., Mengersen, K., et al. (2011). Theoretical analysis of the motion and evaporation of exhaled respiratory droplets of mixed composition. Journal of Aerosol Science, 42, 1–10.

van Doremalen N, B. T. (2020). Aerosol and surface stability of SARS-CoV-2 as compared with SARS-CoV-1. *New England Jouranl of Medicine*, 1564-1567.

Zhang, J., Huntley, D., Gerhardt, B., Vatine, A., & Cherne, J. (2020, August). Study of Viral Filtration Performance of Residential HVAC Filters. *ASHRAE Journal*, 1-6.

Zhu, N. D. (2020). A novel coronavirus from patients with pneumonia in China, 2019. *New England Journal of Medicine* , 727-733.

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

JENNIFER RAE GUNTER, individually and as a
natural parent of A.G.; ROBERT JAY SCHWARTZ,
individually and as a natural parent of J.S.; HOLLY
LYNN GOVE, individually and as a natural parent of
M.G.; CHELSEA ELIZABETH PERRITT, individually
and as a natural parent of L.P.,

Plaintiffs,

v.

NORTH WASCO COUNTY SCHOOL DISTRICT
BOARD OF EDUCATION; CAROLYN BERNAL, in
her individual capacity and in her official capacity as
Superintendent of the North Wasco County Public
School District; and REBECCA THISTLETHWAITE,
DAWN RASMUSSEN, DAVID JONES, JOHN
NELSON, BRIAN STEVENS, JOSE APARICIO,
JUDY RICHARDSON, all in their individual capacities
and in their capacities as members of the North
Wasco County School District Board of Education,

Defendants.

Case No. 3:21-CV-1661-yy

Affidavit Of:
**Jennifer R Gunter**

# AFFIDAVIT

State of Oregon

County of WASCO

I, _Jennifer Rae Gunter_____, being first duly sworn according to law, hereby declare,

under penalty of perjury, that I have full personal knowledge of the events and matters

set forth herein, and that the following is true and accurate to the best of my knowledge:

1. I am a citizen of the State of Oregon.

2. Comes now your affiant, being competent to testify and being over the age of 21 years of age, after being duly sworn according to law to tell the truth to the facts related herein states that she has first-hand knowledge of the facts to be true by the best of her knowledge.

3. Your Affiant is one of the people of the United States of America, being a creation of God and born/domiciled in one of the states.

4. Your Affiant is a living, breathing, sentient being on the land. Natural person and, therefore, is exempt from any and all identification, treatments, and requirements as such pursuant to any process, law, code, or statute of any color thereof.

5. Your Affiant notices that in these United States of America, the authority of any and all governments reside in The People of the land, for government is a fiction of the mind and can only be created by the people, effected by the People, and overseen by the people for the benefit of the people.

6. Your Affiant and her minor child Adisyn Reese Gunter residing in her care and custody at all times claims all and waives NONE of our God given secured and guaranteed rights pursuant to the Declaration of Independence and the constitution of the United States of America as ratified in 1791 with articles of Amendments.

7. Your Affiant notices that pursuant to the Constitution of the United States as ratified in 1791 with Articles and Amendments, Article VI paragraph 2, This Constitution and the laws of the United States which shall be made in pursuance thereof; and all treaties made, under the authority of The United States, shall be

the supreme law of the land, and Judges in every State shall be bound thereby, anything in The Constitution or Laws of any State to the contrary notwithstanding.

8. Your Affiant notices, that as a matter of their lawful compliance to the referenced Constitution, any of The People, while functioning in any Public capacity, in return for the trust of The People, are granted limited delegated authority of and by The People, with specific duties delineated in accordance thereof, shall only do so pursuant to a lawful designated, sworn an subscribed Oath of Office and all bonds required thereof.

9. Your Affiant notices this that only court authorized by referenced Constitution to hear matters of the people is a court that conforms to an functions in accordance with Article III Section 2 or the referenced Constitution in which all Officers of court abide by their sworn and subscribed Oaths of office and support and defend the rights of The People, and are heard only by a trial jury with accordance with all aspects of due process of law.

10. Your Affiant notices that in pursuant to the Supreme Law of the Land and God given Rights secured and granted by God to all People, on this land, shall endure, and ensure that this People on this land be free from any and all slavery, indenturement, tyranny, and oppression under any color of law, statute, code, policy, procedure, or any other type.

11. Your Affiant Jennifer Rae Gunter and her minor child Adisyn Reese Gunter further notices that pursuant to this Constitution, Affiant and her minor child Adisyn Reese Gunter cannot be compelled, manipulated, extorted, tricked, threatened, placed under duress, or coerced, or so effected under color of law by any Natural Person, who individually, or in any capacity as under any Artificial Person,

agency, entity, officer or party into the waiving of any of the Affiants or her minor child Adisyn Reese Gunter Rights or to act in contradiction thereof, or to act in the opposite of moral conscience and dominion granted to Affiant and her minor child Adisyn Reese Gunter by God, nor can Affiant and her child be deprived of any of these Rights, Privileges, and immunities except by lawful process is accordance with the law without that Natural and or Artificial person, and thereby committing numerous crimes, requiring lawful punishment therefrom.

12. Further Affiant Sayeth Naught. ALL RIGHTS RESERVED

I declare under penalty of perjury that the foregoing is true and correct. Executed this 9th day of December, 2021.

Signature

By:
Jennifer Gunter
1601 G St.
The Dalles, OR 97058

## NOTARY ACKNOWLEDGMENT

State of Oregon     )

                         )   **(Seal)**

County of WASCO   )

_____

OFFICIAL STAMP
TINA MARIE KIPPER
NOTARY PUBLIC - OREGON
COMMISSION NO. 997322
MY COMMISSION EXPIRES FEBRUARY 24, 2024

The foregoing instrument was acknowledged before me this 9TH day of December _____, 2021, by the undersigned, Jennifer R Gunter, who is personally known to me or satisfactorily proven to me to be the person whose name is subscribed to the within instrument.

_Tina Kipper_
Signature

_Tina Kipper_
Notary Public

My Commission Expires: February 24, 2024

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

JENNIFER RAE GUNTER, individually and as a
natural parent of A.G.; ROBERT JAY SCHWARTZ,
individually and as a natural parent of J.S.; HOLLY
LYNN GOVE, individually and as a natural parent of
M.G.; CHELSEA ELIZABETH PERRITT, individually
and as a natural parent of L.P.,

Plaintiffs,

v.

NORTH WASCO COUNTY SCHOOL DISTRICT
BOARD OF EDUCATION; CAROLYN BERNAL, in
her individual capacity and in her official capacity as
Superintendent of the North Wasco County Public
School District; and REBECCA THISTLETHWAITE,
DAWN RASMUSSEN, DAVID JONES, JOHN
NELSON, BRIAN STEVENS, JOSE APARICIO,
JUDY RICHARDSON, all in their individual capacities
and in their capacities as members of the North
Wasco County School District Board of Education,

Defendants.

Case No. <u>3:21-CV-1661-yy</u>

<u>Affidavit Of:</u>
<u>Robert Jay Schwartz</u>

# AFFIDAVIT

State of Oregon

County of WASCO

Page _1_ of _6_

I, Robert Jay Schwartz, being first duly sworn according to law, hereby declare, under penalty of perjury, that I have full personal knowledge of the events and matters set forth herein, and that the following is true and accurate to the best of my knowledge:

1. I am a citizen of the State of Oregon.

2. Comes now your affiant, being competent to testify and being over the age of 21 years of age, after being duly sworn according to law to tell the truth to the facts related herein states that he has first-hand knowledge of the facts to be true by the best of his knowledge.

3. Your Affiant is one of the people of the United States of America, being a creation of God and born/domiciled in one of the states.

4. Your Affiant is a living, breathing, sentient being on the land. Natural person and, therefore, is exempt from any and all identification, treatments, and requirements as such pursuant to any process, law, code, or statute of any color thereof.

5. Your Affiant notices that in these United States of America, the authority of any and all governments reside in The People of the land, for government is a fiction of the mind and can only be created by the people, effected by the People, and overseen by the people for the benefit of the people.

6. Your Affiant and his minor child Jace Theo Browning-Schwartz residing in his care and custody at all times claims all and waives NONE of our God given secured and guaranteed rights pursuant to the Declaration of Independence and the

constitution of the United States of America as ratified in 1791 with articles of Amendments.

7.  Your Affiant notices that pursuant to the Constitution of the United States as ratified in 1791 with Articles and Amendments, Article VI paragraph 2, This Constitution and the laws of the United States which shall be made in pursuance thereof; and all treaties made, under the authority of The United States, shall be the supreme law of the land, and Judges in every State shall be bound thereby, anything in The Constitution or Laws of any State to the contrary notwithstanding.

8.  Your Affiant notices, that as a matter of their lawful compliance to the referenced Constitution, any of The People, while functioning in any Public capacity, in return for the trust of The People, are granted limited delegated authority of and by The People, with specific duties delineated in accordance thereof, shall only do so pursuant to a lawful designated, sworn and subscribed Oath of Office and all bonds required thereof.

9.  Your Affiant notices this that only court authorized by referenced Constitution to hear matters of the people is a court that conforms to an functions in accordance with Article III Section 2 or the referenced Constitution in which all Officers of court abide by their sworn and subscribed Oaths of office and support and defend the rights of The People, and are heard only by a trial jury with accordance with all aspects of due process of law.

10. Your Affiant notices that in pursuant to the Supreme Law of the Land and God given Rights secured and granted by God to all People, on this land, shall endure,

Page 3 of 6

and ensure that this People on this land be free from any and all slavery, indenturement, tyranny, and oppression under any color of law, statute, code, policy, procedure, or any other type.

11. Your Affiant Robert Jay Schwartz and his minor child Jace Theo Bowning-Schwartz further notices that pursuant to this Constitution, Affiant and his minor child Jace Theo Browning-Schwartz cannot be compelled, manipulated, extorted, tricked, threatened, placed under duress, or coerced, or so effected under color of law by any Natural Person, who individually, or in any capacity as under any Artificial Person, agency, entity, officer or party into the waiving of any of the Affiants or his minor child Jace Theo Browning-Schwartz Rights or to act in contradiction thereof, or to act in the opposite of moral conscience and dominion granted to Affiant and his minor child Jace Theo Browning-Schwartz by God, nor can Affiant  and her child be deprived of any of these Rights, Privileges, and immunities except by lawful process is accordance with the law without that Natural and or Artificial person, and thereby committing numerous crimes, requiring lawful punishment therefrom.

12. Further Affiant Sayeth Naught. ALL RIGHTS RESERVED

I declare under penalty of perjury that the foregoing is true and correct. Executed this ___ day of December, 2021.

Signature

By:
*Robert Jay Schwartz*
*3135 Mill Creek Rd*
*The Dalles, OR  97058*

**NOTARY ACKNOWLEDGMENT**

State of Oregon                    )

                                   )      **(Seal)**

County of  WASCO                   )

_____

OFFICIAL STAMP
TINA MARIE KIPPER
NOTARY PUBLIC - OREGON
COMMISSION NO. 997322
MY COMMISSION EXPIRES FEBRUARY 24, 2024

The foregoing instrument was acknowledged before me this _9TH_ day of _December_ _____, 2021, by the undersigned, _Robert Jay Schwartz_ who is personally known to me or satisfactorily proven to me to be the person whose name is subscribed to the within instrument.

_Tina Kipper_
Signature

_Tina Kipper_
Notary Public

My Commission Expires: _February 24, 2024_

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

JENNIFER RAE GUNTER, individually and as a
natural parent of A.G.; ROBERT JAY SCHWARTZ,
individually and as a natural parent of J.S.; HOLLY
LYNN GOVE, individually and as a natural parent of
M.G.; CHELSEA ELIZABETH PERRITT, individually
and as a natural parent of L.P.,

         Plaintiffs,

           v.

NORTH WASCO COUNTY SCHOOL DISTRICT
BOARD OF EDUCATION; CAROLYN BERNAL, in
her individual capacity and in her official capacity as
Superintendent of the North Wasco County Public
School District; and REBECCA THISTLETHWAITE,
DAWN RASMUSSEN, DAVID JONES, JOHN
NELSON, BRIAN STEVENS, JOSE APARICIO,
JUDY RICHARDSON, all in their individual capacities
and in their capacities as members of the North
Wasco County School District Board of Education,

         Defendants.

Case No. 3:21-CV-1661-yy

Affidavit Of:
Holly Lynn Gove

# AFFIDAVIT

State of Oregon

County of WASCO

Page 1 of 10

I,, being first duly sworn according to law, hereby declare, under penalty of perjury, that I have full personal knowledge of the events and matters set forth herein, and that the following is true and accurate to the best of my knowledge:

1.  I am a citizen of the State of Oregon.

2.  Comes now your affiant, being competent to testify and being over the age of 21 years of age, after being duly sworn according to law to tell the truth to the facts related herein states that he has first-hand knowledge of the facts to be true by the best of his knowledge.

3.  Your Affiant is one of the people of the United States of America, being a creation of God and born/domiciled in one of the states.

4.  Your Affiant is a living, breathing, sentient being on the land. Natural person and, therefore, is exempt from any and all identification, treatments, and requirements as such pursuant to any process, law, code, or statute of any color thereof.

5.  Your Affiant notices that in these United States of America, the authority of any and all governments reside in The People of the land, for government is a fiction of the mind and can only be created by the people, affected by the People, and overseen by the people for the benefit of the people.

6.  Your Affiant and her minor child Madison Elaina Gove residing in his care and custody at all times claims all and waives NONE of our God given secured and guaranteed rights pursuant to the Declaration of Independence and the

constitution of the United States of America as ratified in 1791 with articles of Amendments.

7. Your Affiant notices that pursuant to the Constitution of the United States as ratified in 1791 with Articles and Amendments, Article VI paragraph 2, This Constitution and the laws of the United States which shall be made in pursuance thereof; and all treaties made, under the authority of The United States, shall be the supreme law of the land, and Judges in every State shall be bound thereby, anything in The Constitution or Laws of any State to the contrary notwithstanding.

8. Your Affiant notices, that as a matter of their lawful compliance to the referenced Constitution, any of The People, while functioning in any Public capacity, in return for the trust of The People, are granted limited delegated authority of and by The People, with specific duties delineated in accordance thereof, shall only do so pursuant to a lawful designated, sworn and subscribed Oath of Office and all bonds required thereof.

9. Your Affiant notices this that only court authorized by referenced Constitution to hear matters of the people is a court that conforms to an functions in accordance with Article III Section 2 or the referenced Constitution in which all Officers of court abide by their sworn and subscribed Oaths of office and support and defend the rights of The People, and are heard only by a trial jury with accordance with all aspects of due process of law.

10. Your Affiant notices that in pursuant to the Supreme Law of the Land and God given Rights secured and granted by God to all People, on this land, shall endure,

and ensure that this People on this land be free from any and all slavery, indenturement, tyranny, and oppression under any color of law, statute, code, policy, procedure, or any other type.

11. Your Affiant Holly Lynn Gove and her minor child Madison Elaina Gove further notices that pursuant to this Constitution, Affiant and her minor child Madison Elaina Gove  cannot be compelled, manipulated, extorted, tricked, threatened, placed under duress, or coerced, or so effected under color of law by any Natural Person, who individually, or in any capacity as under any Artificial Person, agency, entity, officer or party into the waiving of any of the Affiants or her minor child Madison Elaina Gove Rights or to act in contradiction thereof, or to act in the opposite of moral conscience and dominion granted to Affiant and her minor child Madison Eliana Gove by God, nor can Affiant  and her child be deprived of any of these Rights, Privileges, and immunities except by lawful process is accordance with the law without that Natural and or Artificial person, and thereby committing numerous crimes, requiring lawful punishment therefrom.

12.  Further Affiant Sayeth Naught. ALL RIGHTS RESERVED


I declare under penalty of perjury that the foregoing is true and correct. Executed this 8 day of December, 2021.

Signature

By:
*Holly Lynn Gove*

*421 West 15th Street*
*The Dalles, OR  97058*

## NOTARY ACKNOWLEDGMENT

State of Oregon            )
                              )    **(Seal)**

County of  WASCO       )

```
OFFICIAL STAMP
TINA MARIE KIPPER
NOTARY PUBLIC - OREGON
COMMISSION NO. 997322
MY COMMISSION EXPIRES FEBRUARY 24, 2024
```

The foregoing instrument was acknowledged before me this _____ 9TH _____ day of _December_ _____, 2021, by the undersigned, _Holly Lynn Gove_ , who is personally known to me or satisfactorily proven to me to be the person whose name is subscribed to the within instrument.

_Tina Kepper_
Signature

_Tina Kipper_
Notary Public

My Commission Expires: _February 24, 2024_

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

JENNIFER RAE GUNTER, individually and as a
natural parent of A.G.; ROBERT JAY SCHWARTZ,
individually and as a natural parent of J.S.; HOLLY
LYNN GOVE, individually and as a natural parent of
M.G.; CHELSEA ELIZABETH PERRITT, individually
and as a natural parent of L.P.,

Plaintiffs,

v.

NORTH WASCO COUNTY SCHOOL DISTRICT
BOARD OF EDUCATION; CAROLYN BERNAL, in
her individual capacity and in her official capacity as
Superintendent of the North Wasco County Public
School District; and REBECCA THISTLETHWAITE,
DAWN RASMUSSEN, DAVID JONES, JOHN
NELSON, BRIAN STEVENS, JOSE APARICIO,
JUDY RICHARDSON, all in their individual capacities
and in their capacities as members of the North
Wasco County School District Board of Education,

Defendants.

Case No. <u>3:21-CV-1661-yy</u>

<u>Affidavit Of:</u>
<u>Chelsea Elizabeth Perritt</u>

# AFFIDAVIT

State of Oregon

County of WASCO

I, Chelsea Elizabeth Perritt, being first duly sworn according to law, hereby declare, under penalty of perjury, that I have full personal knowledge of the events and matters set forth herein, and that the following is true and accurate to the best of my knowledge:

1. I am a citizen of the State of Oregon.

2. Comes now your affiant, being competent to testify and being over the age of 21 years of age, after being duly sworn according to law to tell the truth to the facts related herein states that she has first-hand knowledge of the facts to be true by the best of her knowledge.

3. Your Affiant is one of the people of the United States of America, being a creation of God and born/domiciled in one of the states.

4. Your Affiant is a living, breathing, sentient being on the land. Natural person and, therefore, is exempt from any and all identification, treatments, and requirements as such pursuant to any process, law, code, or statute of any color thereof.

5. Your Affiant notices that in these United States of America, the authority of any and all governments reside in The People of the land, for government is a fiction of the mind and can only be created by the people, effected by the People, and overseen by the people for the benefit of the people.

6. Your Affiant and her minor child Lillian AudreyGrace Perritt, residing in her care and custody at all times, claims all and waives NONE of our God given secured and guaranteed rights pursuant to the Declaration of Independence and the constitution of the United States of America as ratified in 1791 with articles of Amendments.

7. Your Affiant notices that pursuant to the Constitution of the United States as ratified in 1791 with Articles and Amendments, Article VI paragraph 2, This Constitution and the laws of the United States which shall be made in pursuance thereof; and all treaties made, under the authority of The United States, shall be the supreme law of the land, and Judges in every State shall be bound thereby, anything in The Constitution or Laws of any State to the contrary notwithstanding.

8. Your Affiant notices, that as a matter of their lawful compliance to the referenced Constitution, any of The People, while functioning in any Public capacity, in return for the trust of The People, are granted limited delegated authority of and by The People, with specific duties delineated in accordance thereof, shall only do so pursuant to a lawful designated, sworn and subscribed Oath of Office and all bonds required thereof.

9. Your Affiant notices this that only court authorized by referenced Constitution to hear matters of the people is a court that conforms to an functions in accordance with Article III Section 2 or the referenced Constitution in which all Officers of court abide by their sworn and subscribed Oaths of office and support and defend the rights of The People, and are heard only by a trial jury with accordance with all aspects of due process of law.

10. Your Affiant notices that in pursuant to the Supreme Law of the Land and God given Rights secured and granted by God to all People, on this land, shall endure, and ensure that this People on this land be free from any and all slavery,

indenturement, tyranny, and oppression under any color of law, statute, code, policy, procedure, or any other type.

11. Your Affiant Chelsea Elizabeth Perritt and her minor child Lillian AudreyGrace Perritt further notices that pursuant to this Constitution, Affiant and her minor child Lillian AudreyGrace Perritt cannot be compelled, manipulated, extorted, tricked, threatened, placed under duress, or coerced, or so effected under color of law by any Natural Person, who individually, or in any capacity as under any Artificial Person, agency, entity, officer or party into the waiving of any of the Affiants or her minior child Lillian AudreyGrace Perritt Rights or to act in contradiction thereof, or to act in the opposite of moral conscience and dominion granted to Affiant and her minor child Lillian AudreyGrace Perritt by God, nor can Affiant  and her child be deprived of any of these Rights, Privileges, and immunities except by lawful process is accordance with the law without that Natural and or Artificial person, and thereby committing numerous crimes, requiring lawful punishment therefrom.

12. Further Affiant Sayeth Naught. ALL RIGHTS RESERVED


I declare under penalty of perjury that the foregoing is true and correct. Executed this 1 day of December, 2021.

_____
Signature

By:
*Chelsea Elizabeth Perritt*
*219 West 14th*
*The Dalles, OR 97058*

## NOTARY ACKNOWLEDGMENT

State of Oregon                              )

                                             )    **(Seal)**

County of  WASCO                             )

_____

OFFICIAL STAMP
KYLEE VERLA RUBY
NOTARY PUBLIC - OREGON
COMMISSION NO. 999825
MY COMMISSION EXPIRES MAY 25, 2024

The foregoing instrument was acknowledged before me this _7th_ day of _December_ _____, 2021, by the undersigned, _Chelsea Perritt_, who is personally known to me or satisfactorily proven to me to be the person whose name is subscribed to the within instrument.

_____
Signature

_Kylee V. Ruby_
Notary Public

My Commission Expires: _May 25, 2024_